CHENOWETH–CHAPMAN CORPORA-
TION, a corporation, Respondent,

v.

The AMERICAN INSURANCE COMPA-
NY, a corporation, Appellant.

No. 37435.

Missouri Court of Appeals,
St. Louis District,
Division Four.

June 7, 1977.

Motion for Rehearing and/or Transfer
Denied July 21, 1977.

Barnard, Baer, Lee, Timm & McDaniel,
Herbert E. Barnard, James C. Branden-
burg, St. Louis, for appellant.

Joseph L. Badaracco, Flynn & Parker,
Norman C. Parker, Mary Ann Weems, St.
Louis, for respondent.

ALDEN A. STOCKARD, Special Judge.

This is an appeal by the American Insur-
ance Company from a judgment in this
jury-waived case entered in favor of Chen-
oweth-Chapman Corporation in its action
to recover $7,659.47 based upon the employ-
ee dishonesty coverage of a blanket crime
policy.

Plaintiff operated a laundry and dry
cleaning business at several locations in the
City of St. Louis, one being at 4731 Delmar
Street. Plaintiff alleged that during the
year 1968, while the policy was in effect, it

sustained a loss of $7,659.47 in cash which was brought about by dishonest and fraudulent acts of its employees in failing to remit to plaintiff money collected from customers.

Defendant challenges the admission of certain evidence, but assuming for the purpose of stating the facts that the evidence was admissible, the facts leading up to the claim upon which this suit is based may be stated as follows.

In February 1968, plaintiff's recordkeeping for the "cash and carry" laundry and cleaning business conducted at the Delmar location was placed on an "IBM card system." When a customer left items of clothing at the Delmar store for cleaning, one copy of a numbered tri-copy order ticket was given to the customer, one copy accompanied the clothing through the cleaning process, and one copy was sent to plaintiff's office where an IBM card was prepared and sent to the counter where the customer was to call and pick up his clothing. When the customer presented his numbered order ticket he paid the cleaning charges and received his cleaned clothing. The clerk would then pull the corresponding numbered IBM card from the file and turn it in at the end of the day with the cash received in payment. During 1968 at least three persons worked at the counter to receive clothing to be cleaned, write up the order tickets, receive cash payments, and pull out the matching IBM cards and turn them into the office with the cash received. This method of handling cleaning orders was used for almost eleven months before an audit was made to compare the orders of clothing on hand with the retained IBM cards. The evidence is unsatisfactory concerning the general practice and accepted procedure in making a physical check or audit in a business such as that of plaintiff, but from the total evidence it may reasonably be said that the procedure was to take the master file of IBM cards which had not been returned to the office with the money collected as cleaning charges, and by a physical check determine whether the particular order of clothing identified on each card by a number was on the racks await-

ing delivery to the customer. The audit conducted by Mr. Hartman, who was then vice-president and general manager of plaintiff, disclosed that there were IBM cards in the files for clothing that was not on the racks awaiting delivery to customers, and that the cleaning charges for that clothing amounted to $7,659.47. The figures showing the result of this audit were reduced to writing by Mr. Hartman and were admitted into evidence as Exhibit B. Audits of other stores of plaintiff for the same period disclosed no shortage beyond an acceptable deviation of two percent, and a subsequent audit at the Delmar store covering three months in 1969 disclosed only a fifty cent discrepancy.

No customer claimed that he did not receive his clothing left at the Delmar store to be cleaned. It is plaintiff's contention that this evidence authorized a finding that some employees, the identity of whom is not known, over the period of time in 1968 covered by the Hartman audit delivered the clothing to the customer but failed to turn into the office the cash received. We agree that this is a reasonable conclusion to be drawn from the facts.

The parts of the blanket crime policy relied on by the plaintiff are as follows:

### Insuring Agreements
### Employee Dishonesty Coverage

I. Loss of Money * * * which the Insured shall sustain through any fraudulent or dishonest act or acts committed by any of the Employees, acting alone or in collusion with others.

### Loss Inside The Premises Coverage

II. Loss of Money * * * by the actual destruction, disappearance or wrongful abstraction thereof within the Premises * * *.

The parts of the policy relied on by the defendant are as follows:

### Exclusions

Section 2. This Policy does not apply:

    *     *     *     *     *     *

(b) to loss, or to that part of any loss, as the case may be, the proof of which, either as to its factual existence or as to its amount, is dependent upon an inventory

computation or a profit and loss computation; provided however, that this paragraph shall not apply to loss of Money, * * * which the Insured can prove, through evidence wholly apart from such computations, is sustained by the Insured through any fraudulent or dishonest act or acts committed by any one or more of the Employees;

(c) under Insuring Agreements II and III, to loss due to any fraudulent, dishonest or criminal act by an Employee * * * while working or otherwise and whether alone or in collusion with others; provided this Exclusion does not apply to Safe Burglary or Robbery or attempt thereat.

Plaintiff's contention is that its evidence, admittedly circumstantial in part, authorized a finding that the loss to it of $7,659.47 occurred through dishonest and fraudulent acts of one or more of its employees, and that it is entitled to recover under Insuring Agreement I. But, it further contends that if it be determined that the evidence did not authorize a finding that the loss occurred as the result of fraudulent or dishonest acts by employees, then it is entitled to recover under Insuring Agreement II which insures against "disappearance or wrongful abstraction" absent fraudulent or dishonest acts.

Defendant contends, on the other hand, that (a) the evidence which establishes the existence of a loss was inadmissible, and (b) plaintiff failed to prove it sustained a loss under Insuring Agreements I or II because plaintiff's only evidence of a loss consisted of inventory computations specifically excluded from coverage.

We shall consider first defendant's challenge to the admission into evidence of Exhibit B, the report prepared by Mr. Hartman on December 28, 1968 showing the result of his audit or physical check of the IBM cards and of clothing on the racks. At the time of trial Mr. Hartman was deceased. Therefore, if Exhibit B was admissible in evidence it was because it qualified as a business record pursuant to § 490.680, RSMo 1969, which is as follows: "A record of an act, condition or event, shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time or preparation were such as to justify its admission."

■ Defendant asserts that the trial court erred in admitting into evidence Exhibit B because it "constitutes hearsay and plaintiff failed to meet the requirements of Section 490.680." Of course, if the exhibit was qualified as a business record under § 490.680, it is immaterial that it constituted hearsay. *Allen v. St. Louis Public Service Company,* 365 Mo. 677, 285 S.W.2d 663 (1956). In violation of Rule 84.04(d) this point sets out only an abstract statement that "Plaintiff failed to meet the requirements of Section 490.680" without setting out in what respect there was a failure. This point does not inform plaintiff of the contended deficiency to which it is to respond, and it does not advise this court of the precise question for decision and why it is contended a deficiency existed. In a most liberal exercise of judicial discretion we have examined the argument portion of defendant's brief in an effort to determine the basis for its contention of error.

■ Defendant first asserts in argument that "Parma Kidd, did not qualify as a 'custodian or other qualified witness,'" but there is no statement as to the respects in which it is contended her qualifications were lacking. Mrs. Kidd testified that Exhibit B had been prepared by Mr. Hartman, that it was in his handwriting, and she explained the procedure whereby the master file of IBM cards were used to conduct a physical check against clothing on the racks awaiting delivery to customers. The evidence shows that she was secretary-treasurer of plaintiff, that she was in "charge of the preparation of records," which included anything that related to the "bookkeeping end" of plaintiff's operations. Shortly after Mr. Hartman prepared Exhibit B he gave the record to Mrs. Kidd who thereafter

retained it in the business files of plaintiff. We find no merit whatever to the contention that Mrs. Kidd was not shown to have been the custodian of Exhibit B, or of the records from which it was taken, but in any event, she qualified as an "other qualified witness" who testified to the identity of Exhibit B and the mode of its preparation.

Defendant next asserts in argument that "there was not sufficient evidence of the mode of preparation and the sources of information of Exhibit 'B' so as to justify its admissibility under the Business Records as Evidence Act." It further argues that the "nature of the document" requires "substantial testimony as to the preparation * * *, the computation of the figures thereon and the sources of information from which the figures thereon were obtained."

Mr. Matthey, president of plaintiff, testified that Exhibit B was prepared at his request by Mr. Hartman, and that it represented the results of "an annual record that was prepared by Mr. Hartman" for plaintiff, as an "end of the year record" which was "An actual physical check of each order at each location" that was made "at the end of each year" to "check our balance."

No witness testified that he observed Mr. Hartman in the process of making the audit. Therefore, there was no direct evidence as to the precise manner of preparation of Exhibit B by him. However, Mrs. Kidd testified that the manner of making a physical check or audit in plaintiff's business was to take the "Master [IBM] card file" and to make a "physical count" of the clothing on the racks awaiting return to the customers. She further testified that when she made a "physical count" in February she went to the racks and checked each order, "order by order," and also checked the amount of the charges for cleaning the clothes comprising each order. She also testified that for the "first period" in 1969 no "physical check" was made at the Delmar Store because "this shortage" had been discovered at the end of 1968 and "we went back and audited our sales tickets and everything else to make sure that our figures were correct that we had on our books * * *."

The sources of information available to Mr. Hartman in the preparation of Exhibit B were the IBM cards which were prepared in the regular course of business, and the clothing physically on the racks. Each cleaning order was identified by a number on the attached order ticket which would also appear on the IBM card for that order. As to the method of preparation of Exhibit B, the evidence shows that it was made as the result of a physical check of the clothing on the racks with the IBM cards, that is, a check of the number on the order ticket on the clothing with the number on the IBM card, and a totaling of the cleaning charges on those IBM cards for which there was not an order of clothing on the racks. The trial court admitted Exhibit B into evidence and therefore found that "the sources of information, method and time of preparation were such to justify its admission," and we agree. Exhibit B was qualified as a business record, and was properly admitted.

Defendant also asserts that the court erred in admitting into evidence Exhibits C, D and E because (a) "the figures depicted in such exhibits are dependent upon the figures depicted in plaintiff's Exhibit B," and (b) they "are irrelevant in that they purport to depict conditions which existed after the period of claimed loss."

Our ruling that Exhibit B was properly admitted into evidence results in appellant's first contention under this point being without merit. As to the second contention, the Exhibits were material in that they tended to corroborate the result of the audit by Mr. Hartman. Exhibit B showed a loss at the Delmar store, one of fourteen places audited, but no loss greater than the permitted tolerance at any other place. Exhibits C, D and E, prepared by Mrs. Kidd, showed no loss at any place during the first three months of 1969 greater than the permitted amounts, and a difference of only fifty cents at the Delmar store. Plaintiff's theory was that the loss at the Delmar store resulted from fraudulent and dishonest acts

of an employee or employees. When the loss was discovered, which would be known by the employees, further shortages in money being turned in stopped. Furthermore, this was a court-tried case, the jury being waived. In our review we are to disregard improperly admitted evidence. Assuming that Exhibits C, D and E were not relevant and we disregarded them, the result of this appeal would be the same.

Defendant's final contention is that "plaintiff failed to prove coverage under its insuring agreement" because (a) by "paragraph II" of the insuring agreement "losses due to fraudulent or dishonest acts of employees are specifically excluded from coverage," and because (b) plaintiff failed to prove coverage by "Insuring Agreements I and II" for the reason that plaintiff's only evidence of a loss consisted of "inventory computations specifically excluded from coverage."

No request was made that the trial court enter findings of fact and conclusions of law and none was made. In its judgment the court recited that it had reserved ruling on admission in evidence of Exhibits B, C, D and E, and on an objection to testimony of Mr. Matthey "defining a $13,828.13 figure in Exhibit B." It then ruled the exhibits were admissible and sustained the objection to the testimony of Mr. Matthey, and found "the issue in plaintiff's petition in favor of plaintiff and against defendant" except for plaintiff's claim for vexatious delay and attorney fees, and it entered judgment in favor of plaintiff and against defendant in the amount of $7,659.47. We cannot determine from the record whether the court found for plaintiff under Insuring Agreement I or II. In either event, plaintiff was not entitled to recover by reason of a "loss * * * either as to its factual existence or as to its amount" when the proof of that loss "is dependent upon an inventory computation or a profit and loss computation * * *." The essential question is whether Exhibit B was the result of an "inventory computation" within the meaning of the insuring agreement, and we are of the opinion that it was not.

▬▬ The important words are "loss * * * the proof of which * * * is dependent upon an inventory computation." The term "inventory computation" is not defined in the insurance policy. Therefore we are to assume that it was used in its usual or ordinarily accepted meaning in relation to the subject matter of the insurance agreement. *Paisley v. Lucas,* 346 Mo. 827, 143 S.W.2d 262 (1940); *Greer v. Zurich Insurance Company,* 441 S.W.2d 15 (Mo. 1969). The term "inventory" is subject to several meanings depending on how it is used. In Black's Law Dictionary 4th Ed. it is defined as "A detailed list of articles of property; a list or schedule of property, containing a designation or description of each specific article; an itemized list of various articles constituting a collection, estate, stock in trade, etc., with their estimated or actual values." In § 400.9–109 RSMo 1969, the Uniform Commercial Code, it is provided that "Goods are * * * 'Inventory' if they are held by a person who holds them for sale or lease or to be furnished under contracts for service or if he has so furnished them, or if they are raw materials, work in progress or materials used or consumed in a business." In the comment following the above provision it is stated that "The principal test to determine whether goods are inventory is that they are held for immediate or ultimate sale." In this case the clothing on the racks were not for sale or lease, and they were not raw materials to be processed or consumed in plaintiff's business operation. The clothing was the subject of a bailment to plaintiff to be returned to the customer after the cleaning process.

In *Fort Smith Tobacco & Candy Co. v. American Guar. & L. Ins. Co.,* 208 F.Supp. 244 (D.C.Ark.1962), the court had before it the identical exclusionary provision as in this case, and it quoted with approval from a report by a certified public accounting firm as follows: "An inventory computation is an inventory arrived at by taking a beginning inventory, adding purchases and deducting the cost of merchandise sold. A computed inventory loss, therefore, would

be the difference arrived at by deducting an actual inventory from the inventory computation." We are of the opinion that this correctly expresses the meaning of the terms "inventory," "inventory computation" and "loss * * * dependent on an inventory computation" as used in the policy of insurance and applicable to the operations of plaintiff.

The audit of Mr. Hartman was not an "inventory computation" within the meaning of the term as above defined. Mr. Hartman did not take an "inventory," that is, make a schedule of property in stock for sale or lease. If he made any schedule or list it was of the charges for cleaning noted on the IBM cards for the articles of clothing that were *not* on the racks of the plaintiff's place of business. He did not take a beginning inventory, then add later acquired items and deduct the items returned to customers, or compute an inventory loss.

By this physical check of the IBM cards against the clothes on the racks he determined the amount of money that should have been collected from customers when they claimed their clothing but which had not been turned into the office. This was not a loss determined from an inventory computation in the ordinary and generally accepted meaning of that term.

The factual circumstances in *Sun Insurance Company of N.Y. v. Cullum's Mens Shop, Inc.*, 331 F.2d 988, 991 (5th Cir. 1964), are somewhat comparable to those in this case. In the *Cullum* case the policy of insurance contained the standard provisions identical to those in this case. A substantial loss occurred as the result of employees taking suits of clothing from the racks in the store which were for sale and wrongfully giving them away. By reference to the orders whereby the store purchased suits, and by reference to record notations of size and color entered in what was called a "swatch book" when a suit was sold, the store was able to determine what suits should have been but were not on the racks for sale, and those suits that were not on the racks were considered to have been stolen. The total cost of those suits was the amount sought from the insurer. Each missing suit could be identified by size and color. The court held: "It is clear that * * * proof of the amount of loss did not depend upon an inventory computation such as that defined in the *Fort Smith Tobacco & Candy Co.* case [cited supra] but on the contrary consisted of an enumeration of each missing item, suit by suit, based upon a check of the stock record, the swatch book, against the stock actually on hand." In this case, plaintiff determined the amount of its loss by totaling the individual cleaning charges shown on each IBM card for which a check of the clothing on the racks revealed that there was no item of clothing with a corresponding number.

We conclude that the evidence fully justifies a finding that a loss of money occurred at plaintiff's Delmar store in the amount of $7,659.47 by reason of fraudulent and dishonest acts of plaintiff's employees, and that the loss was proved by a check of the IBM cards against the clothing on the racks awaiting delivery to customers, and that procedure did not constitute proof of a "loss" by "inventory computation" within the meaning of that term as used in the insurance policy.

The judgment is affirmed.

SMITH, P. J., and NORWIN D. HOUSER, Special Judge, concur.