**FIDELITY AND DEPOSIT COMPANY OF MARYLAND, Plaintiff-Appellee,**

v.

**SOUTHERN UTILITIES, INC., et al., Defendants-Appellants.**

No. 83–8105.

United States Court of Appeals, Eleventh Circuit.

March 5, 1984.

Daniel M. Dibble, Kathryn H. Vratil, Kansas City, Mo., for defendants-appellants.

George C. Reid, Atlanta, Ga., Gene Mac Winburn, John J. Barrow, Athens, Ga., for plaintiff-appellee.

Before GODBOLD, Chief Judge, RONEY and KRAVITCH, Circuit Judges.

GODBOLD, Chief Judge:

In this case, in which a jury trial was demanded, the district court, 555 F.Supp. 206, granted a "directed verdict" without a trial and in circumstances where summary judgment was not appropriate. It must be reversed.

Southern Utilities, Inc. is an electrical contractor insured by Fidelity & Deposit

Co. (F & D) under a "Comprehensive Dishonesty, Disappearance and Destruction Policy." The policy covered Southern for employee dishonesty for losses up to $1 million, including

> Loss of Money, Securities and other property which the Insured shall sustain ... through any fraudulent or dishonest act or acts committed by any of the Employees, acting alone or in collusion with others.

Southern notified F & D of its claim that Hayworth, Southern's former vice-president, acquired and converted construction materials worth $261,685.01. F & D refused to pay. Southern brought suit in Missouri state court to recover the loss plus interest, damages, and attorney's fees under Mo.Rev.Stat. §§ 375.296, 375.420 for F & D's vexatious refusal to pay. F & D removed that action to the U.S. District Court W.D. Missouri and filed a third-party complaint against Hayworth seeking indemnity for any sum F & D was required to pay to Southern. Prior to that removal F & D filed a complaint in the U.S. District Court M.D. Georgia, seeking a declaration that F & D had no liability to Southern and that Hayworth would be liable to F & D for any sum it paid Southern. The Missouri action was transferred to M.D. Georgia and the two cases consolidated.

Prior to trial the district court expressed doubt whether Southern could present sufficient evidence to submit the case to a jury. The court utilized plaintiff's trial brief, a narrative statement of evidence required of plaintiff, and a further summary of plaintiff's evidence given at a pretrial conference.[1] It considered this material as though it had been presented in court before a jury and a motion for directed ver-

dict had been made by defendant, and the court then granted a "directed verdict" for F & D and dismissed without prejudice F & D's third-party claim against Hayworth.

The court recognized that the case was not appropriate for summary judgment[2] and that the procedure it used was outside the provisions of the Federal Rules of Civil Procedure. The court based its action on two grounds: (1) judgment may be ordered following a pretrial conference pursuant to Rule 16 if there is no triable issue left at the end of the discussion, and (2) the procedure is analogous to directing a verdict after an opening statement describing the evidence to be presented.

■ Rule 16 by its terms does not confer special powers to enter judgment not contained in Rule 56 or the other rules. The Second Circuit aptly described the relation between Rule 16 and Rule 56 in *Syracuse Broadcasting Corp. v. Newhouse*, 271 F.2d 910, 914 (2d Cir.1959):

> In dismissing the action the district court relied upon Rules 16 and 41(b), 28 U.S.C.A. Rule 16 appears to have been invoked on the theory that dismissal at the pre-trial stage is proper where it clearly appears that plaintiff will be unable to prove the allegations of its complaint. We hold, however, that Rule 16 confers no special power of dismissal not otherwise contained in the rules. Rule 12(b) and Rule 12(c) provide that summary judgment, under Rule 56, is mandatory when matters outside the pleadings are considered in disposing of a motion to dismiss for failure to state a cognizable claim, or for judgment on the pleadings. Disposition under Rule 56 would appear to be no less mandatory when analogous

---

1. Southern's summary of its circumstantial evidence of Hayworth's dishonesty, contained in its brief before this court, is an appendix to this opinion. Our references to Southern's evidence are to this putative evidence. We refer only to what Southern contends the evidence will show and realize that Southern's summary might or might not come to pass.

2. Memorandum letter to counsel from Judge Wilbur D. Owens, Jr. (Oct. 1, 1982), Brief of

Appellant at A–14 ("The court agrees that this is not a case to be considered on motion for summary judgment.") For purposes of our decision we have accepted the conclusion of the district court that this case, in the posture then presented, was inappropriate for summary judgment. Of course, on remand the district court may entertain in its discretion a motion for summary judgment pursuant to the strictures and standard of Rule 56.

motions are considered at the pre-trial stage.

*See also* 6 C. Wright & A. Miller, *Federal Practice and Procedure* § 1525, at 592–93 (1971) (although judgment may be ordered "at the conference if there is no triable issue left at the end of the discussion," the pretrial judge lacks power "to determine disputed issues of fact or to render a decision after all the issues have been presented" (footnotes omitted)). Some of Southern's evidence of employee dishonesty was disputed, and conflicting inferences could be drawn from it.[3] A triable genuine issue of material fact remained after the pretrial conference. Rule 16 did not authorize entry of judgment.

■ Likewise, the court's ability to direct a verdict after an opening statement did not allow entry of judgment. *Best v. District of Columbia,* 291 U.S. 411, 415, 54 S.Ct. 487, 489, 78 L.Ed. 882 (1934), allows the court to direct a verdict after opening statement if the statement shows the plaintiff has no right to recover. *See also Hanley v. U.S.,* 416 F.2d 1160, 1164 (5th Cir.1969), *cert. denied,* 397 U.S. 910, 90 S.Ct. 908, 25 L.Ed.2d 91 (1970). Pretermitting whether this power is available before trial, we hold that the court may not direct a verdict where "the opening statement leaves doubt as to the facts or permits conflicting inferences." *Best,* 291 U.S. at 415, 54 S.Ct. at 489. Where fair-minded men may draw different conclusions from the evidence, "the question is not one of law but of fact to be settled by the jury." *Id.*

■ Moreover, the district court applied incorrect standards in analyzing the evidence. The court appears to have held Southern to the criminal beyond a reasonable doubt standard of proof instead of the civil preponderance of the evidence standard applicable to such claims. *See Savannah Wholesale Co. v. Continental Casualty Co.,* 279 F.2d 706, 708 (5th Cir.1960) (proof of employee dishonesty under policy is by preponderance of the evidence); *Goffe v. National Surety Co.,* 321 Mo. 140, 9 S.W.2d

929, 934 (1928) (employee embezzlement in connection with recovery on fidelity bond need be proven by only a preponderance of the evidence). The court also held that for plaintiff to recover it must present "circumstances which conclude in no other reasonable hypothesis than guilt" (for example, theft or unexplained disappearance of materials from the job site). This is a nonfederal standard for sufficiency of circumstantial evidence. *See Stark v. American Bakeries Co.,* 647 S.W.2d 119, 125 (Mo.1983) (en banc) (under Missouri law in order to survive a motion for directed verdict in a case based on circumstantial evidence, the evidence must tend to exclude every reasonable conclusion other than that sought). The federal standard controls. *See Boeing Co. v. Shipman,* 411 F.2d 365, 368 (5th Cir.1969) (en banc). It is set out in *Daniels v. Twin Oaks Nursing Home,* 692 F.2d 1321, 1323–26 (11th Cir.1982). There we held that a verdict based on circumstantial evidence is not infirm simply because the evidence supports an equally probable inference to the contrary, as long as the inference on which the verdict is based is a reasonable one. *Id.* at 1326. Under federal law, which allows the jury to choose among reasonable inferences in a case based on circumstantial evidence, Southern's evidence is sufficient to survive a motion for directed verdict. Reasonable men could infer that Hayworth converted the goods, that Hayworth was merely negligent, or that someone else outside the company stole the goods.[4] Choosing among reasonable inferences was for a jury in this case, not the district court.

The district court also held that the policy's exclusion for a loss that is dependent upon an inventory calculation or profit or loss computation required entry of judgment for F & D. The policy excluded from coverage loss

the proof of which, either as to its factual existence or as to its amount, is dependent upon an inventory computation or a profit and loss computation; provided, however, that this paragraph shall not

---

3. See appendix.

4. See appendix.

apply to loss of Money, Securities or other property which the Insured can prove, through evidence wholly apart from such computations, is sustained by the Insured through any fraudulent or dishonest act or acts committed by any one or more of the Employees . . . .

The district court held that Southern had failed to provide the court with "sufficient independent facts or circumstances showing that the loss occurred from employee dishonesty . . . which merit allowing defendant to prove its loss by an inventory or profit/loss computation in light of the exclusion in the policy."

An inventory computation is " 'an inventory arrived at by taking a beginning inventory, adding purchases and deducting the cost of merchandise sold.' " *Chenoweth-Chapman Corp. v. American Insurance Co.,* 553 S.W.2d 872, 876 (Mo.App.1977) (quoting *Fort Smith Tobacco & Candy Co. v. American Guarantee & Liability Insurance Co.,* 208 F.Supp. 244, 254 (W.D.Ark.1962)). A profit and loss computation presumably would be a subtraction of expenses from gross receipts. The amount of proof necessary to allow use of inventory or profit or loss comparisons was discussed in *Prager & Bear, Inc. v. Federal Insurance Co.,* 66 Cal. App.3d 970, 975–76, 136 Cal.Rptr. 340, 342–43 (1977):

> Prior to 1970, the weight of authority allowed the use of inventory comparisons only for corroboration of independent evidence of employee dishonesty. As a result, coverage was often denied in spite of fairly convincing evidence of employee dishonesty. No evidence of inventory comparisons was allowed to establish the amount of loss even though employees had confessed to dishonesty in *Locke Distributing Co. v. Hartford Acc. & Indem. Co.* (Mo.App.1966) 407 S.W.2d 658 . . . .

More recent decisions tend to allow an inference of employee dishonesty to be drawn from relatively thin circumstantial evidence and then to permit the full extent of the losses to be proven by inventory comparisons. Generally, these cases have required some proof of dishonesty by employees as a condition precedent to the admission of inventory comparisons

to establish the full amount of loss. In some instances, the amount of loss proven to be a result of dishonesty has been only a small fraction of the total loss claimed.

*See Meyer Jewelry Co. v. General Insurance Co.,* 422 S.W.2d 617, 622–23 (Mo.1968) (independent proof of employee dishonesty allows use of inventory computation to prove full extent of loss and as corroboration to make a sufficient case for finder of fact where independent proof, considered alone, might be insubstantial).

■ F & D contends that Southern's case is based entirely on a difference between the estimate on the materials for a job and the actual cost of the materials. If this were true, proof would be barred under the exclusion. Southern relies, however, not just on the difference in estimate and cost but on other circumstantial evidence as well. *Cf. Chenoweth-Chapman Corp.,* 553 S.W.2d at 877 (use of dry cleaning tickets to establish employee dishonesty by showing amount of money that should have been received was not barred by inventory computation exclusion). Briefly, Southern relies on the following evidence independent of any inventory or profit and loss computation: purchase orders, invoices for goods delivered to the wrong site or never delivered, monthly statements, cancelled checks, building plans, job specifications, bid estimates, testimony by independent experts, and testimony about Hayworth's actions that were consistent with dishonesty, such as ordering a wholesale destruction of invoices and clearing out his desk and leaving his job several hours after being told by his superior to explain discrepancies in the construction records. Sufficient independent evidence of dishonesty existed to allow Southern to rely in addition upon inventory computations to prove the full extent of its loss.

REVERSED.

## APPENDIX

Southern's summary of its circumstantial evidence of Hayworth's dishonesty, contained in Brief of Appellant at 25–32

On August 1, 1979, Southern Utilities hired Hayworth, a qualified and able elec-

trical construction estimator and project manager, as vice-president and general manager. Due to his substantial experience in the electrical construction industry, he was placed in charge of all operations. His specific duties included estimating, purchasing, project contract administration, field work, and general responsibility for the day-to-day operations of Southern Utilities. Upon commencing employment, Hayworth was instructed by Young, his immediate superior, concerning procedures to be followed in selecting jobs to be bid and materials to be used, and ordering and paying for materials. The procedures followed by Southern Utilities in this respect were consistent with those throughout the construction industry as a whole and Hayworth was already familiar with them. After receiving his orientation, Hayworth essentially assumed total control of Southern Utilities' operations, subject only to pre-submission bid approval by Young. Once a contract was obtained, Hayworth had total control over Southern Utilities' involvement. He ordered all materials, purchase orders were prepared only at his direction, only he had authority to approve payment of invoices, and he alone signed checks.

During 1979 and 1980, Southern Utilities received contracts for the Jessamaine Mall at Sumter, South Carolina, the University Mall at Tuscaloosa, Alabama, and the Holiday Inn at Clearwater, Florida. Hayworth had total responsibility for these projects and prepared the take-offs and bids for them. Hayworth's estimate of the total materials cost for the Jessamaine Mall was $554,847.00. He procured materials costing approximately $165,000 more than necessary to complete the job, however, and these materials were paid for by Southern Utilities although they were never incorporated into any Southern Utilities job and they have essentially disappeared.

As the Jessamaine Mall progressed in spring and early summer 1980, Southern Utilities received increasing numbers of invoices for which no supporting purchase orders could be located. Patricia Woods, secretary-bookkeeper for Southern Utilities, was responsible for checking them and, if she could not find the purchase order, calling this fact to Hayworth's attention. On some such occasions, he directed her to pay the invoice anyway and insisted that she prepare the supporting purchase order. On other occasions, he became highly belligerent and said that he would attend to it himself. Hayworth's handling of these invoices was contrary to specific instructions and [to] accepted practice at Southern Utilities and within the industry as a whole.

When Southern Utilities received monthly suppliers' statements, Woods was responsible for determining that the invoices listed thereon had been received by Southern Utilities and had been supported by proper documentation. Frequently, statements from Southeastern Electric Supply Company, a/k/a Bee Electric Company, referenced invoices which could not be located and for which supporting purchase orders could not be found. When Woods called this to Hayworth's attention, he directed that the statements be paid and advised that he would assume responsibility for the missing documentation.

As chief executive officer of Southern Utilities, Young received monthly materials and labor expense reports for each job in progress. At the end of July, 1980, the Jessamaine Mall report showed that materials costs far exceeded what they should have been. Young questioned Hayworth, who attributed the excess cost to delay by other contractors. The re-billing of excess material from one job to another began at about this time, and it continued with increasing frequency until Hayworth's abrupt departure from Southern Utilities in September, 1980.

Hayworth initially trained Woods to prepare take-offs. Shortly after Young discussed with him the increasing materials cost at the Jessamaine Mall, however, Hayworth instructed Woods to discontinue work on take-offs and prevented her access to plans and specifications which would have disclosed what materials were required and not required for given jobs. Hayworth refused to explain this change in procedure.

Hayworth was jealous of his authority and strictly admonished Woods not to discuss his operation of Southern Utilities with anyone, particularly Young or Young's wife. If Woods had questions, she was directed to go to Hayworth and no one else. Although Hayworth's position frequently required him to visit job sites, he generally refused to disclose his itinerary to anyone, including Woods, and he left strict instructions that no bills were to be paid or invoices approved in his absence. He specifically told Woods not to prepare any statements for payment or tender any checks for Young to sign in his absence.

As summer, 1980, progressed, Southern Utilities continued to receive statements for which the invoices and/or supporting purchase orders could not be located. At about this time, Woods discovered that Hayworth maintained a private file of selected invoices and purchase orders. Hayworth represented that he was personally taking care of these matters and that Woods should not review them. As it eventually turned out, this file involved materials re-billed from the Jessamaine Mall job to other sites. Also, some of the invoices directed that materials be shipped to the Southern Utilities home office—an extraordinary and unjustified instruction.

When the Jessamaine Mall was complete, very few materials were left over. Experience suggests that up to $10,000 worth of materials should have remained. In this case, however, only some excess light fixtures and about $1,500 worth of small diameter wire was found. In addition, certain files are usually kept in the project supervisor's office at the job site, including copies of delivery receipts, plans, specifications, and work orders. When the job is complete, the cabinets containing these records are returned to the home office, where the contents are retained indefinitely. The cabinets from the Jessamaine Mall project were returned empty. Ed Horn, the project supervisor, had destroyed the contents at Hayworth's direction.

On September 24, 1980, Young found an invoice for materials billed to the Florida job which he knew should have been billed to another job. He called this fact to Hayworth's attention and told him that he wanted to straighten it out right after lunch. Young returned from lunch, however, to find that Hayworth had cleaned out his desk and departed with no explanation.

Southern Utilities subsequently assembled every purchase order, invoice, and statement pertaining to the Jessamaine Mall contract, as well as cancelled checks in payment thereof. These documents conclusively demonstrate that approximately $165,000 worth of excess material was ordered by Hayworth and paid for by Southern Utilities. Southern Utilities also determined what materials were incorporated in the Jessamaine Mall; Thurman Anglin, Southern Utilities foreman, made a detailed physical inspection of the Mall and concluded that the excess materials (especially the wire and conduit) could not possibly have been legitimately incorporated therein. The materials have not been otherwise accounted for. Young and Paul Britton, a construction consultant, reviewed Hayworth's initial calculations and found that he accurately estimated the amount of materials necessary for the job. Britton, like Anglin, will testify that the materials ordered could not have been incorporated in the Jessamaine Mall.

Contractors generally have insurance against theft or mysterious disappearance of materials from the job site, and it was Ed Horn's duty to report any such disappearance. His failure to do so suggests either that no disappearances occurred or that he was implicated in such disappearances as did occur. Horn himself has disappeared and efforts to find him have been unavailing.

(footnotes and citations omitted).