206 F.Supp.2d 968 (2002)
HARTFORD UNDERWRITER'S INSURANCE COMPANY, Plaintiff,
v.
ESTATE OF Bettie Lee TURKS, Defendant.
No. 4:01-CV-168 CAS.
United States District Court, E.D. Missouri, Eastern Division.
April 30, 2002.
*969 *970 Russell F. Watters, Brown and James, P.C., St. Louis, MO, for plaintiff.
John A. Lally, Aubuchon and Raniere, St. Louis, MO, for defendant.

MEMORANDUM AND ORDER
SHAW, District Judge.
This declaratory judgment matter is before the Court on the parties' cross-motions for summary judgment. This case concerns whether a homeowner's insurance policy issued by plaintiff provides coverage for the policy holder for a lawsuit arising out of an alleged lead poisoning. For the following reasons, the Court will grant plaintiff's motion for summary judgment and deny defendant's motion for summary judgment.

I. Summary Judgment Standard.

The standards applicable to summary judgment motions are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment if all of the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
With this principle in mind, the Court turns to an examination of the undisputed facts.

II. Background.

This dispute arises from the interpretation and application of the Homeowner's Policy Pollution Exclusion contained in a homeowner's policy issued to defendant Bettie Lee Turks by plaintiff Hartford Underwriter's Insurance Company, ("Hartford"). *971 The policy provides, in part, as follows:
Section IPerils Insured Against
*ZA
COVERAGE CPERSONAL PROPERTY
We insure for direct physical loss to the property described in Coverage C caused by a peril listed below unless the loss is excluded in SECTION 1EXCLUSIONS.
1. Fire or lightning.
2. Windstorm or hail.
This peril does not include loss to the property contained in a building caused by rain, snow, sleet, sand or dust unless the direct force of wind or hail damages the building causing an opening in a roof or wall and the rain, snow, sleet, sand or dust enters through this opening. This peril includes loss to watercraft and their trailers, furnishings, equipment, and outboard engines or motors, only while inside a fully enclosed building.
3. Explosion.
4. Riot or civil commotion.
5. Aircraft, including self-propelled missiles and spacecraft.
6. Vehicles.
7. Smoke, meaning sudden and accidental damage from smoke.
This peril does not include loss caused by smoke from agricultural smudging or industrial operations.
8. Vandalism or malicious mischief.
9. Theft, including attempted theft and loss of property from a known place when it is likely that the property has been stolen.
This peril does not include loss caused by theft:
a. Committed by an insured;
b. In or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is finished and occupied; or
c. From that part of a residence premises rented by an insured to other than an insured.
This peril does not include loss caused by theft that occurs off the residence premises of:
a. Property while at any other residence owned by, rented to, or occupied by an insured, except while and insured is temporarily living there. Property of a student who is an insured is covered while at a residence away from home if the student has been there at any time during the 45 days immediately before the loss;
b. Watercraft, and their furnishings, equipment and outboard engines or motors; or
c. Trailers and campers.
10. Falling Objects
This peril does not include loss to property contained in a building unless the roof or an outside wall of the building is first damaged by a falling object. Damage to the falling object itself is not included.
11. Weight of ice, snow or sleet which causes damage to property contained in a building.
12. Accidental discharge or overflow of water of steam from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance.
This peril does not include loss:
a. To the system or appliance from which the water of steam escaped;
b. Caused by or resulting from freezing except as provided in the peril of freezing below; or
c. On the residence premises caused by accidental discharge or overflow *972 which occurs off the residence premises.
In this peril, a plumbing system does not include a sump, sump pump or related equipment.
13. Sudden and accidental tearing apart, cracking, burning or bulging of a steam or hot water heating system, an air conditioning or automatic fire protective sprinkler system, or an appliance for heating water.
We do not cover loss caused by or resulting from freezing under this peril.
14. Freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance.
This peril does not include loss on the residence premises while the dwelling is unoccupied, unless you have used reasonable care to:
a. Maintain heat in the building; or
b. Shut off the water supply and drain the system and appliances of water.
15. Sudden and accidental damage from artificially generated electrical current.
This peril does not include loss of a tube, transistor or similar electronic component.
16. Volcanic eruption other than loss caused by earthquake, land shock waves or tremors.
* * * * * *
SECTION IILIABILITY COVERAGES
Coverage EPersonal Liability
If a claim is made or a suit is brought against an insured for damages because of bodily injury or property damage caused by an occurrence to which this coverage applies, we will:
1. Pay up to our limit of liability for the damages for which the insured is legally liable. Damages include prejudgment interest awarded against the insured; and
2. Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when the amount we pay for damages resulting from the occurrence equals our limit of liability.
* * * * * *
The policy issued to Turks contained the following relevant endorsements, among others, providing as follows:
HOMEOWNERS POLICY POLLUTION EXCLUSION
The following is added to Section II Exclusions:
m. Arising out of the discharge, dispersal, seepage, migration, release, or escape of pollutants unless the discharge, dispersal, seepage, migration, release or escape was caused by a peril insured against under Coverage C of this policy. POLLUTANTS mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, lead paint, oils and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

A. Lawsuit in the Circuit Court.

Tony Stewart, by and through his next friend and guardian, Shanthia Swift, filed a petition for damages in the Circuit Court of the City of St. Louis, Missouri, naming Bettie Lee Turks as a defendant. Stewart alleges that he suffered damages as a result of lead paint poisoning due to Turk's failure and refusal to remove or abate paint containing dangerous levels of lead on premises controlled by defendant and *973 occupied by Stewart. Stewart alleges that Turks was negligent in her conduct because she: (1) failed to inspect the premises for lead; (2) failed to warn the occupants about the presence or danger of lead paint; (3) failed to remove, adequately abate, or adequately maintain the unsafe lead paint in the premises occupied by Stewart in a timely and safe manner; (4) violated the provisions of Ordinance No. 56091, the Lead Poisoning Control Law for the City of St. Louis; and (5) failed to exercise ordinary care with the amount of vigilance and control required for the provision of safe housing. As a result, Stewart alleges that he was exposed to the unsafe lead contained within and about the premises, which proximately caused him physical and cognitive injuries, and that Turks' negligence was the proximate cause of his lead poisoning and resulting injuries. The petition does not state how the alleged exposure occurred.
Plaintiff Hartford Underwriter's Insurance Company ("Hartford") filed this action for Declaratory Judgment against defendant Bettie Lee Turks, seeking a declaration of its rights and duties under a policy of homeowners insurance. Specifically, plaintiff denies that it has an obligation to defend or indemnify defendant with respect to the lawsuit filed by Tony Stewart in the Circuit Court of the City of St. Louis, Missouri. On July 24, 2001, a Conservator was appointed for defendant and the Estate of Bettie Lee Turks was substituted as defendant in this action.

B. Parties' Arguments.

Plaintiff moves for summary judgment arguing that there is no coverage under the policy for the allegations of Tony Stewart for the following reasons. First, plaintiff argues that the pollution exclusion in the policy is not ambiguous. Plaintiff contends that the exclusion clearly provides to exclude coverage for the injury arising out of the "discharge, dispersal, seepage, migration, release or escape of a pollutant." Second, plaintiff asserts that lead paint is a pollutant under the policy. Plaintiff also asserts that the policy specifically defines the term pollutant to include lead paint. As such, plaintiff contends that the definition must be enforced as written. Third, plaintiff argues that the alleged injuries of Tony Stewart arise out of the discharge, dispersal, seepage, migration, release or escape of a pollutant, which is excluded under the policy. Plaintiff further argues that even though the policy does not define the terms discharge, dispersal, seepage, migration, release or escape, under Missouri law, where a term is not defined within a policy, courts assume that the term is used in its ordinary and accepted meaning. According to plaintiff, the definition for each of these words includes a movement of something from one place to another. Plaintiff asserts that clearly implicit in Stewart's petition is that lead or lead paint somehow got into his body or blood stream, and in order for the paint to have gotten into Stewart's body, plaintiff asserts it must have somehow moved from the wall or ceiling where the paint was located. Plaintiff further asserts that this could have been by flaking or chipping of the paint and ingestion of those flakes or chips by Stewart or deterioration of the paint into dust or fumes which were inhaled. Plaintiff finally asserts that the escape of the pollutant is not the result of one of the specified perils in Coverage C of the policy. Therefore, plaintiff contends that it has no duty to defend or indemnify.
Defendant responds that the pollution exclusion is not applicable because it does not unambiguously exclude coverage for injuries arising out of the negligent conduct alleged in the underlying complaint, namely the failure to inspect the premises, *974 failure to warn of the presence of lead paint, and failure to remove or abate the lead paint. In addition, defendant contends that the pollution exclusion is not applicable because it is ambiguous as applied to the facts in that there is no reference to the source of the pollutants and a reasonable insured would not interpret the exclusion as applying to the process of paint chips flaking from walls inside of a home, but rather to environmental sources or activities which involve storage or handling of pollutants. Defendant finally contends that the pollution exclusion is not applicable because the exclusion contains an exception for discharge of pollutants caused by "falling objects" and the flaking of paint chips constitutes falling objects.
Plaintiff replies that it was the exposure to the lead paint which caused Stewart's injuries and that exposure was the result of the discharge, dispersal, seepage, migration, release or escape of the pollutant lead paint. As a result, plaintiff contends that Stewart's injuries are excluded by the policy. Plaintiff argues that even though the acts of the defendant may constitute an occurrence, the exclusion bars injury arising out of the discharge, dispersal, seepage, migration, release or escape of a pollutant. Plaintiff asserts that the term "arising out of" is not ambiguous as suggested by defendant. Plaintiff also asserts that the term pollutant is not limited to traditional environmental pollutants, relying on Cincinnati Insurance Co. v. German St. Vincent Orphan Ass'n., Inc., 54 S.W.3d 661 (Mo.Ct.App.2001). Plaintiff finally asserts that the exception to the exclusion for falling objects is not applicable.
Defendant moves for summary judgment, asserting the following: In the petition filed against defendant, there are absolutely no allegations that she caused the discharge, dispersal, seepage, migration, release or escape of the lead paint in the premises. Tony Stewart seeks to impose liability for alleged negligent conduct in failing to inspect the premises, failing to warn of the presence of lead paint, and failing to remove or abate said lead paint. Defendant contends that this alleged negligent conduct is not excluded from coverage by the pollution exclusion at issue. Defendant also contends that plaintiff bears the burden of proof on any question involving the application of a policy exclusion, and plaintiff has not produced any evidence that the injuries alleged arise from the discharge, dispersal, seepage, migration, release or escape of lead paint. Defendant argues that pursuant to Coverage Epersonal liability contained in the policy at issue, plaintiff agreed to provide coverage to defendant "if a claim is made or a suit is brought against an insured for damages because of bodily injury or property damage caused by an occurrence to which this coverage applies." According to defendant, the term occurrence is defined in the policy to mean "an accident, including continuous or repeated exposure to substantially the same general harmful condition...."

III. Discussion.

Jurisdiction in this case is based on diversity of citizenship. 28 U.S.C. § 1332(a). Plaintiff is an Indiana Corporation with its principal place of business in Indiana. Defendant is a resident of Missouri. The value of defending and indemnifying defendant in the negligence action, combined with the demand for damages, exceeds the $75,000 statutory minimum. See Sanders v. Clemco Indus., 823 F.2d 214, 215 n. 1 (8th Cir.1987). Because this is a diversity case, and the parties have not specified otherwise, Missouri law controls. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).
*975 Under Missouri law, insurance policies are contracts to which the rules of contract construction apply. Peters v. Employers' Mut. Cas. Co., 853 S.W.2d 300, 301-02 (Mo.1993) (en banc). The interpretation of the meaning of an insurance policy is a question of law. Cawthon v. State Farm Fire & Cas. Co., 965 F.Supp. 1262, 1264 (W.D.Mo.1997); Mansion Hills Condo. Ass'n v. Am. Family Mut. Ins. Co., 62 S.W.3d 633, 636 (Mo.Ct.App.2001). If a policy is unambiguous, it will be enforced as written absent a statute or public policy requiring coverage. American Family Mut. Ins. Co. v. Ward, 789 S.W.2d 791, 795 (Mo.1990) (en banc).
An ambiguity arises when there is duplicity, indistinctness or uncertainty in the meaning of words used in the contract. Rodriguez v. Gen. Accident Ins. Co. of Am., 808 S.W.2d 379, 382 (Mo.1991) (en banc). Language is ambiguous if it is reasonably open to different constructions, and the language used will be tested in light of the meaning which would normally be understood by the layperson who bought and paid for the policy. Robin v. Blue Cross Hosp. Serv., Inc., 637 S.W.2d 695, 698 (Mo.1982) (en banc). Where provisions of a policy are ambiguous, they are construed against the insurer. Behr v. Blue Cross Hosp. Serv., Inc., 715 S.W.2d 251, 255 (Mo.1986) (en banc). Under Missouri law, the insurer bears the burden of proof on any question involving the application of a policy exclusion. Trans World Airlines, Inc. v. Associated Aviation Underwriters, 58 S.W.3d 609, 618-19 (Mo.Ct. App.2001).
As previously noted, the key contract language relating to the policy exclusions provides:
HOMEOWNERS POLICY POLLUTION EXCLUSION
The following is added to Section II Exclusions:
m. Arising out of the discharge, dispersal, seepage, migration, release, or escape of pollutants unless the discharge, dispersal, seepage, migration, release or escape was caused by a peril insured against under Coverage C of the policy. POLLUTANTS mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, chemicals, lead paint, oils and waste. Waste includes materials to be recycled, reconditioned, or reclaimed.
The term "pollutant" is defined in the policy as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, chemicals, lead paint, oils and waste." Where a term is defined in a policy and it is clear and unambiguous, Missouri courts give effect to the definition in the policy and enforce it as written. State Farm Fire & Cas. Co. v. Berra, 891 S.W.2d 150 (Mo.Ct. App.1995). There is no question that the term lead paint is defined in the policy as a pollutant, therefore, no ambiguity exists concerning that point. In interpreting the pollution exclusion clause in defendant's insurance policy, the Court concludes that the lead paint present in the apartment occupied by Stewart is a pollutant as defined by the policy.
It is not clear from the record how Stewart was injured by the lead paint. The Petition states only that Stewart was exposed to lead paint, and does not allege whether Stewart inhaled lead dust, ingested chipped flakes or both. Normally, "[l]ead paint is not hazardous when it remains embedded in a wall; it becomes so only when it is somehow released from the wall and ingested by humans." Dorchester Mut. Fire Ins. Co. v. First Kostas Corp. Inc., 1998 WL 90742 *3 (Mass.Super.1998). Lead poisoning is usually caused by the inhalation of lead-contaminated dust particles *976 or toxic lead fumes through respiration or the ingestion of lead-based paint chips by mouth. Lin-fu, J., Vulnerability of Children to Lead Exposure and Toxicity, 289 N.Eng.Med. 1129, 1231 (1973). Consequently, the Court finds that implicit in the Petition must be an allegation that the lead paint somehow separated from the wall or ceiling and entered the air, thus allowing Stewart to come in contact with the lead.
The issue is whether Stewart's injuries arose from the "discharge, dispersal, release or escape of pollutants." The words discharge, dispersal, seepage, migration, release or escape are not defined in the policy. Words in an insurance policy are to be given their ordinary and popular meanings. Chenoweth-Chapman Corp. v. Am. Ins. Co., 553 S.W.2d 872, 876 (Mo. Ct.App.1977). To determine the ordinary meaning of a term, the courts consult standard English dictionaries. Farmland Indus., Inc. v. Republic Ins. Co., 941 S.W.2d 505, 508 (Mo.1997) (en banc). The verb "discharge" is defined, in part, as "3. To pour forth contents." Webster's II, New Riverside Dictionary 333 (1994). The word "dispersal" comes from the verb disperse which is defined as "[t]o break up and scatter in various directions." Id. at 388. The word escape is defined as "[t]o get free." Id. at 442. The word "seepage" is defined as "[t]he act or process of seeping." Seeping means "[t]o pass slowly through small opening or pores: OOZE." Id. at 1056. The word "migration" comes from the verb migrate which means "[t]o change location periodically." Id. at 751. Finally, the word release means "[t]o set free from confinement." Id. at 992. Each one of these definition describe some type of movement from one place to another, from a contained position to a free one.
A federal district court, when interpreting Missouri law, is "bound by the decisions of the Supreme Court of Missouri." B.B. v. Continental Ins. Co., 8 F.3d 1288, 1291 (8th Cir.1993). When the Missouri Supreme Court has not directly ruled on the issues presented, "a federal court may consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue." State of Missouri v. City of Glasgow, 152 F.3d 802, 805-06 (8th Cir.1998) (quoting Continental Ins. Co., 8 F.3d at 1291). Even though "federal courts are not bound to follow the decisions of intermediate state courts when interpreting state law, state appellate court decisions are highly persuasive and should be followed when they are the best evidence of state law." Baxter Int'l., Inc. v. Morris, 976 F.2d 1189, 1196 (8th Cir.1992) (citing Aetna Casualty & Sur. Co. v. Gen. Dynamics Corp., 968 F.2d 707, 712-13 (8th Cir.1992)).
Missouri courts have not considered whether exposure to lead paint through ingestion or inhalation constitutes a discharge, dispersal, escape, seepage or migration. Several courts in other jurisdictions have found that the presence of lead dust or chips in an apartment qualifies as a discharge, dispersal or a release. See, e.g., Peace v. Northwestern Nat'l. Ins. Co., 228 Wis.2d 106, 596 N.W.2d 429, 439 (1999) (when lead-based paint either chipped, flaked, or deteriorated into dust or fumes, that action was a "discharge, dispersal, release, or escape" within the meaning of a pollution exclusion clause in a landlord's commercial general liability policy). See also St. Leger v. American Fire & Cas. Ins. Co., 870 F.Supp. 641, 643 (E.D.Pa.1994) (holding lead paint poisoning covered by the pollution exclusion), aff'd without opinion, 61 F.3d 896 (3d Cir.1995); Oates by Oates v. State, 157 *977 Misc.2d 618, 621, 597 N.Y.S.2d 550 (N.Y.Ct.Cl.1993) (same); cf. Sphere Drake Ins. Co. v. Y.L. Realty Co., 990 F.Supp. 240, 243 (S.D.N.Y.1997) ("Lead paint poisoning is not caused by `discharge, dispersal, release or escape'; rather, lead poisoning results from ingestion or inhalation of paint that has flaked over time."). Because the majority of jurisdictions have held that lead-based paint is covered by pollution exclusions in insurance policies similar to the present policy, the Court finds these decisions persuasive.
Defendant argues that the pollution exclusion should be applied only to traditional environmental pollution. Missouri courts, however, have refused to restrict pollution exclusions to traditional environmental pollution in other contexts. In Cincinnati Insurance Co., 54 S.W.3d at 666, the insured alleged that the pollution exclusion was not applicable to friable asbestos because the pollution exclusion was applicable only to traditional environmental exclusions. The court held that "the language of the policy clearly applies the exclusion to the `discharge [or] release .... of pollutants.' We cannot read the word `environment' into the policy to limit pollutants.'" Id. See also Boulevard Inv. Co. v. Capitol Indem. Corp., 27 S.W.3d 856, 858 (Mo.Ct.App.2000) (holding grease and other contaminants were "waste," defined as a pollutant within the policy, and therefore, policy's pollution exclusion barred coverage); Casualty Indem. Exchange v. City of Sparta, 997 S.W.2d 545, 550 (Mo.App.1999) (holding that the insured need not be in violation of an environmental law for the pollution exclusion to apply).
Following the Missouri courts, and the cases from other jurisdictions with analogous holdings cited above, this Court will not limit the pollution exclusion to traditional environmental pollution. Moreover, unlike the facts of Cincinnati Insurance Co., the present policy specifically lists lead paint under the definition of pollutant. Therefore, if the Court concluded that lead paint is not a pollutant, the Court would be ignoring the explicit language of the policy.
Defendant also argues that the pollution exclusion is not applicable because the exclusion contains an exception for discharge of pollutants caused by "falling objects" and flaking of paint chips constitutes falling objects. The burden of proving the applicability of an exception to an exclusion is placed on the party seeking the benefit of the exception. Trans World Airlines, Inc., 58 S.W.3d at 621. Thus, defendant has the burden to prove that the discharge, dispersal, seepage, migration, release or escape of the lead paint was caused by a falling object. Defendant, however, has failed to provide the Court with any authority to support its claim.

III. Conclusion.

The Court finds that when lead-based paint either chips, flakes or deteriorates to dust, that action is a discharge, dispersal, release, or escape within the meaning of the terms in the policy. As a result, the policy excludes coverage for lead poisoning injuries arising out of the ingestion or inhalation of lead derived from lead-based paint chips, flakes, or dust. For the foregoing reasons, plaintiff's motion for summary judgment will be granted and defendant's motion for summary judgment will be denied.
Accordingly,
IT IS HEREBY ORDERED that plaintiff's motion for summary judgment is GRANTED. [Doc. 16].
IT IS FURTHER ORDERED that defendant's motion for summary judgment is DENIED. [Doc. 17].
*978 An appropriate judgment will accompany this order and memorandum.

JUDGMENT
In accordance with the Memorandum and Order of this date and incorporated herein,
IT IS HEREBY ORDERED, ADJUDGED and DECLARED that judgment is entered in favor of plaintiff Hartford Underwriters Insurance Company, and against defendant Estate of Bettie Lee Turks, and that the policy issued by plaintiff to defendant excludes coverage for lead poisoning injuries arising out of the ingestion or inhalation of lead derived from lead-based paint chips, flakes, or dust.