MADDOX, Justice.
This appeal involves the construction of a “pollution exclusion” in a liability insurance policy. Plaintiffs, landowners living adjacent to a real estate development, filed a class action against defendants, Woodhaven Lakes Estates, Molton, Allen and Williams, Inc., Garrison Construction Company, and other fictitious parties, in which they alleged that the defendants, in developing a subdivision, negligently caused sand and dirt to pass from the subdivision onto their property. Another similar action was also filed against the developers and it was consolidated with the class action suit. Developer, Molton, Allen and Williams, filed a third-party complaint in both actions against its public liability insurer, St. Paul Fire and Marine Insurance Company, seeking indemnity under the terms of two contracts. The third-party actions were consolidated and tried upon a stipulation of facts and other designated exhibits, including a jar of the “sand” or “mud.” The trial court entered a final judgment on the third-party claims, finding that St. Paul is not due to afford the developer a defense or pay any judgment obtained against it because a “pollution” exclusionary clause in each policy is effective to exclude insurance coverage for the liability, or potential liability, of the developer arising out of its activities that are the subject matter of the principal actions. The circuit court ordered the third-party complaints against St. Paul to be dismissed with prejudice. The trial court, pursuant to Rule 54(b), determined that there was no just reason for delay, and directed the entry of a final judgment on the third-party claims. The developer appealed. We reverse.
STATEMENT OF THE FACTS
In the early spring of 1972, Molton, Allen and Williams began a real estate development (Woodhaven Lakes Subdivision) on land adjacent to plaintiffs. Most of the Woodhaven Subdivision property is located on a mountain that rises above three lakes and the natural flow of surface water during rainfall is from the land of the Woodha-ven development onto the land of the plaintiffs. As the natural flow of surface water is dictated by the terrain, rainwater and surface water pass from the Woodhaven land onto the plaintiffs’ land in natural depressions, wet-weather streams and natural streams. Beginning in 1972, some or all of the defendants began constructing roads in connection with the Woodhaven development. Approximately eleven miles of roads were cleared and cut, and drainage ditches were built alongside the roads. The roads remained unpaved at least until the spring of 1974, when the second principal action was filed.
The earth in the Woodhaven Subdivision is composed in part of sandstone. During the delay between the time the roads were physically located and the date the roads were paved, rain fell upon and flowed across the roads, adjacent ditches, and cuts and fills caused by the construction. It is *97 alleged that the rain and surface water washed or carried the sandstone and sandstone-type materials found naturally in the earth to break down into sand and that this material was deposited onto the plaintiffs’ property and into the three lakes, thus destroying the beauty of plaintiffs’ property and the usefulness and beauty of the lakes.
St. Paul issued two policies of insurance to Molton, Allen and Williams which afforded to it property damage insurance. The original policy (No. 601 NA 2839) had an effective date of May 4, 1972. The second poliey (No. 601 NA 3485) had an effective date of May 4, 1973.
The disputed policy provisions of the original and second poliey, respectively, read:
“It is agreed that the Insuring Agreement to which this endorsement is attached does not apply to bodily injury or property damage arising out of the discharge, dispersal, release of escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials, or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this endorsement does not apply if such discharge, dispersal, release or escape is sudden and accidental and is neither expected nor intended from the standpoint of the insured.”
‡ ‡ ‡ ‡ * ‡
“This Insuring Agreement does not apply:
“To bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids, or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden or accidental.”
ISSUES
1. Whether or not under the terms of either “pollution exclusion” in the policy of insurance here' involved, the washing of natural materials from the earth, such as sand, from a construction site, down wet-weather streams by virtue of rainfall, is an intentional, expected and nonaccidental discharge, dispersal, release or escape of smoke, vapor, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants.
2. Whether or not under the terms of a “pollution exclusion” in a policy of insurance the washing of natural materials from the earth, such as sand, down wet-weather streams by virtue of rainfall from a real estate development is an intentional act from the standpoint of the insured performed with the specific intent to cause harm to a third party. .
Molton, Allen and Williams contends that exclusions in insurance . policies are construed most strongly against the insurer. Molton, Allen and Williams points out that “pollution exclusions” are relatively new to the insurance industry and research reveals that there are no decisions which construe this type of pollution exclusion under this factual situation. Thus, this is a case of first impression, not only in Alabama, but perhaps for the country.
Molton, Allen and Williams contends that the washing of sand down wet-weather streams by virtue of rainfall into the lakes owned by the plaintiffs was not an intentional act resulting in an intentional injury within the meaning of the pollution exclusions. Molton, Allen and Williams further contends that the courts, in construing “intentional act” exclusion clauses have consistently held that not only must the act of the insured be done intentionally to avoid coverage, but it also must be done with the specific intent to cause harm to a third party. Molton, Allen and Williams asserts that the burden of proof is on St. Paul to establish its defense that Molton, Allen and Williams’ claim is barred by the exclusionary provisions of the policies. St. Paul, on the other hand, contends that the language of the policy does not require that there be *98 an element of conscious intent to damage particular property.
Molton, Allen and Williams argues that the “pollution exclusions” contemplate only the discharge of foreign matter or industrial refuse into the environment and upon reading the pollution exclusion as a whole, it is clear that these exclusions were not intended to cover the unintentional washing of sand by virtue of rainfall into plaintiffs’ lakes. Molton, Allen and Williams’ theory is that the exclusions are directed solely to intentional discharges by an industrial operation of foreign matter or industrial refuse into the environment. Molton, Allen and Williams says that the term “sand” cannot be construed to fall within a general class of substances, i. e., “irritants, contaminants or pollutants,” and that the doctrine of ejmdem generis should be applied to determine whether or not sand falls within the general class of foreign material contemplated by the exclusion clauses.
St. Paul counters that the general terms of the pollution exclusion should not be limited to a description of industrial wastes. St. Paul further says that a fair reading of the exclusions requires the conclusion that mud, soil, sand, and natural materials from the earth, which are alleged to have damaged and destroyed property, constitute “irritants, contaminants, or pollutants” as those terms are generally understood. In reply, Molton, Allen and Williams asserts that if it had been the intent of St. Paul to give the terms, “irritant, contaminant or pollutant” the broadest possible meaning, it could have done so by omitting from the pollution exclusion the terms which immediately precede them. However, by expressly including within the pollution exclusion specific terms such as “smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials,” and following those specific terms with general terms, it means that the general terms are necessarily limited to the same kind and class as the substances specifically enumerated. In reply, St. Paul maintains that it should not be expected to list every substance that could conceivably pollute in the exclusion clause because such an exclusion would become unwieldly.
St. Paul also asserts that the alleged damage was caused by erosion, and, therefore, it is obvious that this damage did not occur suddenly. St. Paul points out that the flow of mud and sand onto plaintiffs’ land and into the lakes lasted at least two years. St. Paul contends that the pollution in the instant case was the natural and ordinary consequences of the actions of Molton, Allen and Williams and other defendants and therefore, the erosion was foreseeable. Accordingly, St. Paul’s position is that the pollution exclusions are applicable and therefore there is no insurance coverage of the liability of Molton, Allen and Williams that may be imposed as a result of Molton, Allen and Williams’ activities on the Woodhaven Subdivision.
As Molton, Allen and Williams points out, the “pollution exclusion” clauses are relatively new. The pollution exclusion clauses in the policies under review are almost identical to Standard Provisions for General Liability Insurance. See Long, the Law of Liability Insurance, Vol. 3, 1976, App. 30, App. 58, and App. 68, where the author sets out the clause in question and comments on it. The Standard clause in Long’s work reads as follows:
“ * * * (f) to bodily injury or property arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water, but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental;
“Comment
“Since the pollution exclusion is now part of the policy, the pollution exclusion endorsement is not required.”
The comment is as follows:
“Pollution: Exclusion (f) is new. It eliminates coverage for damages arising out of pollution or contamination, where such damages appear to be expected or *99 intended on the part of the insured and hence are excluded by definition of ‘occurrence.’ Coverage is afforded for damages caused by pollution or contamination if the discharge, dispersal, release, or escape is sudden and accidental. (See N.Y. Ins. Law, Sec. 46, Subdiv. 13 and 14 as amended 1971)”.
As noted, Molton, Allen and Williams claims that the pollution exclusion clauses here, strictly construed, were intended to cover only industrial pollution and contamination. We agree with that position. We do not believe that the insured real estate developer, by a reading of the exclusion clause would reasonably expect that the alleged damage caused by its construction activity would be included in the descriptions set out in the “pollution exclusion” clause. In other words, while a liberal construction of the “pollution exclusion” clause would include the damage allegedly caused by Molton, Allen and Williams, the clause is not free of ambiguity. It is believed that the intent of the “pollution exclusion” clause was to eliminate coverage for damages arising out of pollution or contamination by industry-related activities. The use of specific industry-related irritants, contaminants and pollutants seem to indicate this was the reason for the exclusion. We judicially know that during the last decade, much emphasis has been placed upon protecting the environment. The pollution exclusion was no doubt designed to decrease the risk where an insured was putting smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into the environment. In any event, the clause here is ambiguous.
The ambiguities, therefore, must be interpreted against the party drawing the contract if the circumstances surrounding the contract do not make the terms clear. U. S. F. & G. v. Elba Wood Products, Ala., 337 So.2d 1305 (1976).
We do not hold that construction activity and real estate development cannot be “polluting.” In an article entitled “Effect of Waste Discharge Regulations on Real Property Development,” Professor Nicholas H. White (Real Property, Probate and Trust Journal, Vol. 11, No. 3, Fall 1976, p. 490) suggests that real property development may be a “nonpoint source” of pollution. He writes:
“In considering the impact of the FWPCA on real property development, it is useful to distinguish between the control of ‘point sources’ and ‘nonpoint sources’ of water pollution. ‘Point source’ is defined in the FWPCA:
The term ‘point source’ means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged.
‘Nonpoint sources’ are not expressly defined in the FWPCA, but guidelines issued by the United States Environmental Protection Agency (EPA) state:
Nonpoint sources, while not defined in the Act, are, by inference, the accumulated pollutants in the stream, diffuse runoff, seepage, and percolation contributing to the degradation of the quality of surface and ground waters. They include the natural sources (seeps, springs, etc.) and millions of small point sources that presently are not covered by effluent permits under the National Pollution Discharge Elimination System.
“The regulation and control of both point sources and nonpoint sources are usually necessary to attain desired water quality goals. Point sources are much easier to identify and control, and their regulation and control may have both direct and indirect effects on land use decisions. The regulation and control of nonpoint sources are usually more directly related to land use decisions, — i. e., land use controls are foremost among the ‘tools’ that can be utilized to control non-point sources of water pollution.” [Footnotes omitted.]
*100 Whether the activity here was covered under either federal or state law, as those laws regulate environmental pollution, is not the question. The question is whether the “pollution exclusion” clause applies. We hold that it does not. By so holding, however, we should not be understood as holding that sand or mud could never be an irritant, contaminant or pollutant, or that the insurance company could not write an exclusion clause which would cover the activity here involved. We hold only that this policy clause, under the stipulated facts of this case, does not eliminate coverage.
REVERSED AND REMANDED.
TORBERT, C. J., and FAULKNER, SHORES and BEATTY, JJ., concur.