**ASSOCIATED SCRAP METAL, INC., Plaintiff,**

v.

**ROYAL GLOBE INSURANCE COMPANY, a/k/a Royal Insurance Company of America, Defendant.**

**Civil Action No. 94–0277–P–S.**

United States District Court, S.D. Alabama, Southern Division.

Nov. 9, 1995.

Fred W. Killion, Jr. and Fred W. Killion, III, Killion & Vollmer, Mobile, AL, for plaintiff.

Stanley A. Cash, Birmingham, AL, Walter J. Price, III, Huie, Fernambucq & Stewart, Birmingham, AL, Michael J. Athans, and Jeffrey R. Darby, Atlanta, GA, for defendant.

*OPINION AND ORDER*

PITTMAN, Senior District Judge.

On August 1, 1995, this declaratory judgment action came before the court for a non-jury trial to determine the claims of Associated Scrap Metal, Inc. ("Associated Scrap") against Royal Insurance Company of America (formerly known as Royal Globe Insurance Company, "Royal"). The court, having carefully considered the testimony of the witnesses, the exhibits, arguments of counsel, and the record herein, makes the following Findings of Fact and Conclusions of Law.

*Findings of Fact*

Plaintiff Associated Scrap is a corporation organized and existing under the laws of the State of Alabama, with its principal place of business in Mobile, Alabama. Defendant Royal is and was a corporation existing under the laws of the State of Illinois and was engaged in business in Mobile, Alabama. (Joint Pretrial Doc., p. 8).

Defendant Royal issued four comprehensive general liability policies to Associated Scrap for the respective policy periods as shown:

(a) Royal Policy No. P LU 44 15 38, effective November 9, 1977, to November 9, 1978;

(b) Royal Policy No. P LU 49 73 57, effective November 9, 1978, to November 9, 1979;

(c) Royal Policy No. P LU 54 68 22, effective November 9, 1979, to January 10, 1980; and

(d) Royal Policy No. P YA 16 18 72, effective January 10, 1980, to January 10, 1981. (Joint Pretrial Doc., tab 54, pp. 8–9; Complaint, tab 1, Exs. A, B, C, and D).

These policies issued by Royal (hereinafter referred to as "the policies") contained the following language:

COVERAGE B–PROPERTY DAMAGE LIABILITY

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of

.    .    .    .    .

COVERAGE B–PROPERTY DAMAGE

to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such ... property damage, even if any of the allegations of the suit are groundless, false or fraudulent....

**"occurrence"** means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

**EXCLUSIONS**

This insurance does not apply:

.    .    .    .    .

(f) To **bodily injury or property damage** arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials, or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; *but this exclusion does not apply if such discharge, dispersal or release or escape is sudden and accidental....*

See Exhibits A, B, C, and D attached to Complaint at Part I, Coverage B Section (f) (tab 1) (emphasis added). This particular exclusion is referred to as a "pollution exclusion" clause; the italicized portion is referred to as the "exception to the exclusion" clause, or for ease of reference, the "exception" clause.

The word "accident" and the term "sudden and accidental" are not defined in the policies.

Associated Scrap conducted a general scrap metal business, during the course of which it obtained a number of motor vehicle batteries. (Joint Pretrial Doc., tab 54, p. 1). Between May 24, 1978 and November 12, 1979, Associated Scrap sold batteries to Sapp Battery Services, Inc. ("Sapp Battery") in Jackson County, Florida. (See tab 73 under seal, Ex. 2, pp. EPA 00055, 00171). According to the United States Environmental Protection Agency (EPA) documents, Sapp Battery would crack open used batter-

ies to recover the lead therein and dump the acid from the battery, which drained into a swamp and then into Steele City Bay. Sapp Battery disposed of broken battery cases in a man-made fishing pond that was located alongside a swamp. (tab 73, p. EPA 00171).

Joseph Leavitt, III, who was the President of Associated Scrap between May 1978 and November 1979, testified at trial that neither the discharge, dispersal, release or escape of the battery fluid and/or battery casings nor any property damage which resulted from such disposition of the battery fluid and/or casings was expected or intended from the standpoint of Associated Scrap. Associated Scrap sold the batteries to Sapp Battery for recycling not knowing that the battery acid or casings would be handled so as to contaminate the ground, groundwater or bay at or in proximity with the Sapp Battery operations. He also testified that Associated Scrap had shown Royal's representative the nature of its operations, including the accumulation and sale of batteries and had requested insurance coverage to protect it against any and all liability regarding such operation.

Between August 1988 and April 1991, the EPA discovered that a release of hazardous substances had occurred at the Sapp Battery site, and identified Associated Scrap as a potential responsible party with respect to clean-up costs at the site. On or about May 6, 1991, the EPA notified Associated Scrap of its potential liability and demanded payment for costs in response to conditions at the Sapp Battery site. Associated Scrap made demand upon its carrier, Royal. In a letter dated September 23, 1991, Royal, relying on the "pollution exclusion" clause, declined to provide coverage for defense or indemnification for damages arising out of Associated Scrap's involvement with the site. In February 1993, Associated Scrap was contacted regarding the opportunity to join the "Sapp Battery Site Group," an organization of over fifty companies who had signed a consent decree with the EPA to finance and perform the clean-up from the soil contamination of the Sapp Battery site. Associated Scrap de-

clined, and was sued by members of the group in a complaint, dated April 23, 1993. Associated Scrap again made a demand upon Royal for coverage. Royal again declined to provide coverage on the grounds previously cited.

Associated Scrap filed a complaint in the Circuit Court of Mobile County, Alabama, on February 11, 1994; defendant Royal removed the case to this court on the basis of diversity of citizenship. The only issue at trial was whether the Royal policies provide coverage for the damage assessed by the EPA against Associated Scrap.

### Conclusions of Law

This court has diversity jurisdiction in this action pursuant to 28 U.S.C. § 1332. Plaintiff is an Alabama corporation, and defendant is an Illinois corporation, for purposes of diversity. The amount in controversy exceeds $50,000.[1]

Alabama law applies to this action, *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and hence, this court is "bound to decide the case the way it appears the state's highest court would." *Towne Realty, Inc. v. Safeco Ins. Co.,* 854 F.2d 1264, 1269 n. 5 (11th Cir.1988).

In order for Associated Scrap to prevail on the coverage issue, it must show that it falls within the general coverage definition, and that coverage is not precluded by the "pollution exclusion" clause. Specifically, Associated Scrap must prove 1) that the Sapp Battery Site damage constituted an "occurrence," as defined by the policy, and 2) that such damage was "sudden and accidental" under the "pollution exclusion" clause.

The defendant contends that *Hicks v. American Resources Ins. Co., infra,* disposes of the issues in this case. However, as hereinafter pointed out, that case did not address the issues of "sudden and accidental" for reasons unknown to this court. For the reasons hereafter stated, this court has come to the conclusion that the previous rulings of

---

1. The pleadings do not identify the amount in controversy. However, in a volumetric rating of all Potentially Responsible Parties prepared by the EPA, Associated Scrap is estimated to owe $178,294.30. (Pl.Tr.Ex. 1, letter from EPA to Associated Scrap dated July 22, 1991, attachments, p. 1.)

the Alabama Supreme Court on the term "accident" leave the question unanswered as to how it would define the phrase "sudden and accidental." Following *Erie,* this court concludes that the phrase would allow coverage in this case.

■ With respect to "occurrence" as it is defined in the Royal policies (hereinbefore set out), there are three issues: whether there was an accident, whether there was bodily injury or property damage, and whether such injury or damage was expected or intended from the standpoint of the insured. In Alabama, the term "accident" is defined as " 'something unforeseen, unexpected or unusual.' " *Tate v. Gov't Employees Ins. Co.,* 997 F.2d 1433, 1436 (11th Cir. 1993) (quoting *United States Fidelity & Guar. Co. v. Bonitz Insulation Co.,* 424 So.2d 569, 572 (Ala.1982)). Further, the policies themselves define "accident" to include "continuous or repeated exposure to conditions." Therefore, the repeated pouring over a period of more than a year and a half of acid from batteries provided by Associated Scrap constitutes an "accident" within the meaning of the policies. Further, the EPA has indicated that there was damage to the environment as a result of the battery acid subsequently drained into the swamp and Steele City Bay. Finally, Joseph L. Leavitt, III, President of Associated Scrap during the pertinent time, testified that such damage was unexpected and unintended from the standpoint of Associated Scrap. Accordingly, the court finds that there was an "occurrence" as defined in the policies. Unless the "pollution exclusion" clause applies, coverage would be provided under the policies.

■ It is undisputed that under the "pollution exclusion" clause, there was "property damage . . . arising out of the discharge . . . of acids . . . into or upon land, the atmosphere or any water course or body of water." According to the terms of the policies, such damage is excluded from coverage unless it was "sudden and accidental" under the "exception" clause. Whether the "exception" clause applies depends, then, solely upon the interpretation of the phrase "sudden and accidental." Associated Scrap maintains that such language includes gradual and continuous damage, while Royal argues that it includes only non-gradual damage, or damage that occurs abruptly.

Alabama has determined the meaning of "accidental" but not when used in conjunction with "sudden." The Alabama courts have addressed, however, the "pollution exclusion" clause in general, and a review of these cases will assist this court in determining how the Alabama Supreme Court would interpret the "sudden and accidental" language.

The Alabama Supreme Court first addressed the "pollution exclusion" clause in *Molton, Allen & Williams, Inc. v. St. Paul Fire & Marine Ins.,* 347 So.2d 95 (Ala.1977). A homeowner had sued a neighborhood developer for allegedly causing sandstone and sand-type materials to wash down from developing roads into her property and adjoining lakes. *Id.* at 96. The developer sued its insurer for indemnity under two policies, both of which included the "pollution exclusion" clause. Those clauses also contained "exception" clauses as follow. The first policy read, "but this [exclusion] endorsement does not apply if such discharge, dispersal, release, or escape is *sudden* and *accidental* and is *neither expected nor intended* from the standpoint of the insured." The second policy read, "but this exclusion does not apply if such discharge, dispersal, release, or escape is *sudden* or *accidental.*" *Id.* at 97. (emphasis added in both). The court found such clauses to be ambiguous. However, the court focused on the policy behind the clause, concluding that the clause was meant to exclude coverage of industry-related pollution, and not natural run-off such as sand. *Id.* at 99. "[T]he intent of the "pollution exclusion" clause was to eliminate coverage for damages arising out of pollution or contamination by industry-related activities," and did not rule on the "sudden or accidental" provision.

The second case that addressed the "pollution exclusion" clause (which also contained an "exception" clause) was *United States Fidelity & Guar. Co. v. Armstrong,* 479 So.2d 1164 (Ala.1985). U.S.F. & G. brought a declaratory judgment action to determine its liability to a landowner, when two engineering companies it insured were involved in a city sewage project which resulted in raw

sewage flowing onto the landowner's property. Consistent with *Molton, supra,* the court found that the "pollution exclusion" clause was ambiguous and applied the industrial waste vs. natural waste distinction. The court concluded that raw sewage was intended to be covered, *id.* at 1168, and did not discuss the "exception" clause.

Most recently, the Alabama Supreme Court decided *Hicks v. American Resources Ins. Co.,* 544 So.2d 952 (Ala.1989), which involved runoff and seepage from strip mining operations into the Hickses' water supply. The trial court noted *Molton* and *Armstrong,* and determined that unlike those cases, there was no ambiguity in the Hickses' policy because the pollution was made up of "acids, alkalis, and toxic chemicals" as listed in the "pollution exclusion" clause. The Alabama Supreme Court affirmed, rejecting the Hickses' argument on appeal that the cause of the pollution was natural and not industrial in nature, and held there was no coverage. The court ended its analysis and did not address the "sudden and accidental" language of the "exception" clause.

To summarize, in both *Molton* and *Armstrong,* the court did not need to define the "exception" clause to the "pollution exclusion" clause because there was no pollution as referred to in the "pollution exclusion" clause, i.e., industrial pollution. Therefore, there was no coverage under the policy. In all three cases, the damage was caused by pollution that could be described as gradual.

The Eleventh Circuit has addressed this issue only once, and that was with respect to Georgia law, but the case offers some guidance. In *Claussen v. Aetna Casualty & Surety Co.,* 888 F.2d 747, 749 (11th Cir.1989) (per curiam), the court addressed the exact same issue before this court—"whether, as a matter of law, the pollution exclusion clause contained in the comprehensive general liability insurance policy precludes coverage to its insured for liability for the environmental contamination caused by the discharge of pollutants at the site over an extended period of time?" The trial court had found the policy language to be unambiguous and had ruled in favor of the insurer. Upon appeal, the Eleventh Circuit certified the question to the Georgia Supreme Court, which found the policy language to be ambiguous, and then rejected the insurer's interpretation of the word "sudden" as "abrupt." The court held specifically that "sudden" means "unexpected" and that the continuous dumping of waste was covered. The Eleventh Circuit adopted the opinion of the Georgia Supreme Court as its own, and reversed the trial court.

Under Alabama law, when doubt exists as to whether coverage under an insurance policy is provided, language used by the insurer must be construed for the benefit of the insured. Likewise, if ambiguity exists in the language of the exclusion, the exclusion will be construed narrowly so as to limit the exclusion to the narrowest application reasonable under the wording. *Guaranty Nat'l Ins. Co. v. Marshall County Bd. of Educ.,* 540 So.2d 745, 748 (Ala.1989). Moreover, exceptions to insurance coverage are to be interpreted as narrowly as possible in order to provide maximum coverage for the insured, and such clauses must be construed most strongly against the company that issued the policy. *State Farm Mutual Auto. Ins. Co. v. Lewis,* 514 So.2d 863, 865 (Ala. 1987). *See also, Wakefield v. State Farm Mutual Auto. Ins. Co.,* 572 So.2d 1220 (Ala. 1990); *Smith v. Horace Mann Ins. Co.,* 713 F.2d 674 (11th Cir.1983). Finally, contract provisions must be construed together so that a harmonious operation can be given to each provision. *United States Fidelity & Guaranty Co. v. Jacksonville State Univ.,* 357 So.2d 952, 955 (Ala.1978).

Associated Scrap argues that the "exception" clause allows coverage because the seepage was "sudden and accidental," meaning "unexpected and unintended." Royal contends that the word "sudden" must be defined temporally to mean not gradual, and that if the court were to interpret sudden to mean unexpected, it would fail to give meaning to all terms in the policy.

This court has already determined that there was an "occurrence" as defined by the policies. If there were not an "occurrence" the policies would not apply here, and the court would have no reason to address the "pollution exclusion" clause. Thus, the court

has determined that the damage was unexpected and unintended. Moving on to the "pollution exclusion" clause, if the court were to interpret "sudden and accidental" as "unexpected and unintended," this would result in circular reasoning: there is coverage if unexpected and unintended, but not if caused by pollution, unless it was unexpected and unintended.

Just as the Alabama Supreme Court did in *Molton,* this court must determine Royal's intent—in this case, whether in the early 1970s when Royal inserted a pollution exclusion clause into its policies, it intended to add anything to the coverage analysis with the phrase "sudden and accidental," or whether Royal simply intended to reiterate that the pollution must not be intentional.

A document apparently issued by Royal [2] states:

> The exclusion also was supposed to have the effect of providing incentive for industry to take measures to prevent and control potential pollution situations.

> In the states of Maryland, New Hampshire and Vermont the [exclusion] has not been approved. In these states ... *we are providing coverage for both sudden and non-sudden* pollution incidents. (Pl.Ex. 86).

(emphasis added). No distinction was made between sudden and accidental, implying that if the damage was sudden, it was accidental. Furthermore, Royal's Information Bulletin issued in 1970 states:

> Considerable time and study have been given by the insurance industry to the matter of coverage ... for injury or damage caused by pollution or contamination. You are aware of the publicity given to pollution of the environment, and the interest in the matter at all levels of government. It is generally agreed that it would be contrary to public policy for insurance companies to provide coverage against this hazard intentionally caused. In many cases the bodily injury or property damage can be said to be expected or intended and, therefore, excluded by reason of the definition of occurrence. While coverage is probably provided when injury or damage caused by pollution is *sudden or accidental,* it appears [that even accidental *oil* spills should not be covered].

(Pl.Ex. 88, p. RYL 00072) (emphasis added). Again, no distinction was made between sudden and accidental; in fact, they appear to have the same meaning here.

Thus, the court finds that no distinction should be made between gradual and non-gradual pollution under the policies at hand. The language "sudden and accidental" merely clarifies that the damage must be unexpected and unintended. Such interpretation finds support in dictionaries.[3] The dictionaries include more than one explanation of the term "sudden." Therefore, the term is ambiguous. Because the defendant insurer drafted the policy, the term is to be construed more favorably to the insured and against the drafter. The court finds that the evidence does not support that sudden must mean abrupt, but rather that it means unexpected, or happening without notice.

Given the above reasons, and the fact that the Alabama Supreme Court has never found that gradual pollution is precluded by the term "sudden and accidental," the court finds that Royal has a duty to defend Associated Scrap and to indemnify Associated Scrap for any liability it might incur for the Sapp Battery incident.

---

2. The document is entitled, "Liability Underwriting G__e" and was submitted with Royal Globe Insurance Information Bulletins (Pl.Exs. 85 & 87), and the document states, *"we are providing coverage."* (emphasis added).

3. *Webster's New Collegiate Dictionary* (1975), at page 1164 (Pl.Ex. 96), defines the word "sudden" as: 1. happening or coming unexpectedly; 2. marked by or manifesting abruptness or haste. *Webster's Third New International Dictionary* (1966), at page 2284, defines the word "sudden" as: "occur unexpectedly ... coming or occurring unexpectedly ... abrupt ..." *Black's Law Dictionary* 1600 (5th ed. 1979) (Pl.Ex. 199) omits any temporal definition of the word "sudden," defining it as "happening without previous notice; coming or occurring unexpectedly; unforeseen; unprepared for."