United States District Judge Ira DeMent, acting pursuant to Rule 18, Ala.R.App.P., certified to this Court the following question of law, the answer to which he anticipates will be dispositive of a case pending before him:
 "Does the pollution exclusion clause contained in Audubon's comprehensive general liability insurance policy preclude coverage to its insured for liability for injuries allegedly caused from the ingestion of lead contained in paint, blinds, water, pipes and soil on premises operated by the insured?"
The case pending before Judge DeMent is styled "In the United States District Court for the Middle District of Alabama, Northern Division:Janice Denise Porterfield, as mother and next friend of YolandaPorterfield and Mary Charlissa Porterfield, and Housing Authority for theCity of Montgomery, Plaintiffs v. Audubon Indemnity Co., Defendant, Civil Action No. 00-D-1291-N." Judge DeMent has *Page 791 
transmitted to this Court the entire record in the case. Further, he stated in his order certifying the question that "[t]he phrasing of the question is not intended to limit the inquiry of the Supreme Court of Alabama. In answering the certified question, the Supreme Court is at liberty to consider the problems and issues involved in this case as it perceives them." Accepting that invitation, and consonant with established procedure for answering a certified question, this Court has revised the question slightly, to frame it as follows:
 "Does an `absolute' pollution-exclusion clause contained in a commercial general liability insurance policy exclude coverage for injuries resulting from the ingestion of lead contained in the paint, blinds, water, pipes, and soil on premises under the control of the insured?"
The "absolute pollution-exclusion clause" at issue, contained in the commercial general liability insurance policy issued to the Housing Authority for the City of Montgomery ("MHA") by Audubon Indemnity Company ("Audubon") for the period July 1, 1991, to July 1, 1992, reads as follows:
"II. Exceptions
"This insurance does not apply to:
". . . .
 "f.(1) `Bodily injury' or `property damage' arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants:
"(a) At or from premises you own, rent or occupy;
 "(b) At or from any site or location used by or for you or others for the handling, storage, disposal, processing or treatment of waste;
 "(c) Which are at any time transported, handled, stored, treated, disposed of, or processed as waste by or for you or any person or organization for whom you may be legally responsible; or
 "(d) At or from any site or location on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations:
 "(i) if the pollutants are brought on or to the site or location in connection with such operations; or
 "(ii) if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize the pollutants.
 "(2) Any loss, cost, or expense arising out of any governmental direction or request that you test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants.
 "Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed."
The certified question inquires concerning the effect on "coverage" of the exclusion under the circumstances recited. Although we have retained that frame of reference, the coverage question actually subdivides into two discrete aspects: "The duty to defend" and "the duty to indemnify."
 "It is well settled `that [an] insurer's duty to defend is more extensive than its duty to [indemnify]. United States Fid. Guar. Co. v. Armstrong, 479 So.2d 1164, 1168 (Ala. 1985) (citations omitted). Whether an insurance company owes its insured a duty to provide a defense in proceedings instituted against the insured is determined primarily by the allegations contained in the complaint. Id. at 1168. If the allegations of the injured party's complaint show an accident *Page 792 
or occurrence within the coverage of the policy, then the insurer is obligated to defend, regardless of the ultimate liability of the insured. Ladner Co. v. Southern Guar. Ins. Co., 347 So.2d 100, 102 (Ala. 1977) (citing Goldberg v. Lumber Mut. Cas. Ins. Co., 297 N.Y. 148, 77 N.E.2d 131 (1948)).
 "However, '[t]his Court . . . has rejected the argument that the insurer's obligation to defend must be determined solely from the facts alleged in the complaint in the action against the insured.' Ladner, 347 So.2d at 103. In Pacific Indemnity Co. v. Run-A-Ford Co., 276 Ala. 311, 161 So.2d 789 (1964), this Court explained:
 "`We are of opinion that in deciding whether a complaint alleges such injury, the court is not limited to the bare allegations of the complaint in the action against insured but may also look to facts which may be proved by admissible evidence. . . .'
 "276 Ala. at 318, 161 So.2d at 795; see Ladner, 347 So.2d at 103 (quoting this language). '[I]f there is any uncertainty as to whether the complaint alleges facts that would invoke the duty to defend, the insurer must investigate the facts surrounding the incident that gave rise to the complaint in order to determine whether it has a duty to defend the insured.' Blackburn v. Fidelity Deposit Co. of Maryland, 667 So.2d 661, 668 (Ala. 1995) (citing United States Fid. Guar. Co. v. Armstrong, 479 So.2d 1164 (Ala. 1985)) (other citations omitted). When a complaint alleges both acts covered under the policy and acts not covered, the insurer is under a duty to at least defend the allegations covered by the policy. Blackburn, 667 So.2d at 670 (citing Tapscott v. Allstate Ins. Co., 526 So.2d 570, 574 (Ala. 1988))."
Acceptance Ins. Co. v. Brown, 832 So.2d 1, 14 (Ala. 2001).
Although the bare allegations of the complaint may trigger an insurer's duty to defend its insureds, "[t]he duty to pay . . . must be analyzed separately." United States Fid. Guar. Co. v. Armstrong,479 So.2d 1164, 1167 (Ala. 1985).
The parties, in their "coverage" arguments in their respective briefs, have not discriminated between the duty to defend and the duty to indemnify, but the practical difference between the two concepts requires that they be analyzed separately.
The lawsuit that underlies the action presently pending before Judge DeMent, and which was also handled by him, was styled "Janice Denise Porterfield, as mother and next friend of Yolanda Porterfield and Mary Charlissa Porterfield, Plaintiff v. Housing Authority of the City of Montgomery, et al., Civil Action No. 98-D-133-N" (hereinafter referred to as the "underlying lawsuit"). In addition to MHA, three other companies were sued. Audubon was not a party to that action. The underlying lawsuit was settled according to the terms of an extensive "Settlement Agreement" executed by the plaintiffs and the four defendants on August 10, 2000, and that agreement was ratified and approved in a 15-page "Pro Ami Settlement Order and Judgment" entered by Judge DeMent on that same date. By the terms of the settlement, MHA participated with the other defendants in funding an immediate payment of damages and the purchase of an annuity to supply an income stream to "Special Needs Trusts" established for the benefit of the two minor plaintiffs. An additional $1,000,000 award of damages was ordered, but satisfaction of that award was to be limited to only such sums as might be owing by Audubon on behalf of MHA under the terms of *Page 793 
Audubon's comprehensive general liability insurance policy.
Judge DeMent provides in his certification order the following summary of the allegations contained in the complaint in the underlying lawsuit:
 "As alleged in the underlying complaint, as amended, Porterfield's children sustained permanent injuries, both physical and mental, as a result of inhaling and ingesting lead, which was contained in the blinds, in the paint which was `peeling and flaking,' in the water, in the pipes, and in the soil surrounding the complex. Allegedly, the problem was exacerbated by a refurbishment project conducted at the housing complex which `disturbed the chipping lead paint and caused lead dust and paint chips to be disbursed.' Based upon these facts, Porterfield brought several causes of action against the MHA under both federal and state law, the state law claims sounding primarily in negligence/wantonness."
(Footnotes omitted.)
Although that complaint did indeed allege that the refurbishment project disturbed the chipping lead paint and caused lead dust and paint chips containing lead to be "disbursed," it also specifically alleged that the refurbishment "created lead dust from the lead paint."
The pollution-exclusion clause in question is customarily referred to as an "absolute pollution-exclusion clause." Judge DeMent refers to it that way in his certification order. He references Nationwide MutualInsurance Co. v. Richardson, 270 F.3d 948, 952-53 (D.C. Cir. 2001), as a case providing "a concise discussion of the history of the pollution exclusion clause." That history has also been reconstructed and recapitulated in a number of other cases, including Westchester FireInsurance Co. v. City of Pittsburgh, Kansas, 768 F. Supp. 1463 (D.Kan. 1991); Bernhardt v. Hartford Fire Insurance Co., 102 Md. App. 45,648 A.2d 1047 (1994); Center for Creative Studies v. Aetna Life Casualty Co., 871 F. Supp. 941 (E.D.Mich. 1994); Red Panther ChemicalCo. v. Insurance Co. of Pennsylvania, 43 F.3d 514 (10th Cir. 1994);Sullins v. Allstate Insurance Co., 340 Md. 503, 667 A.2d 617 (1995);Morton International, Inc. v. General Accident Insurance Co., 134 N.J. 1,629 A.2d 831 (1993); American States Insurance Co. v. Koloms,177 Ill.2d 473, 687 N.E.2d 72, 227 Ill. Dec. 149 (1997); Peace v.Northwestern National Insurance Co., 228 Wis.2d 106, 596 N.W.2d 429
(1999); and Doerr v. Mobil Oil Corp., 774 So.2d 119 (La. 2000). See also John N. Ellison et al., Recent Developments in the Law Regarding the"Absolute" and "Total" Pollution Exclusion, the "Sudden and Accidental"Pollution Exclusion, and Treatment of the "Occurrence" Definition, (ALI-ABA Course of Study Materials, Environmental Insurance: Past, Present, and Future, June 14-15, 2001); and 9 Lee R. Russ Thomas F. Segalla, Couch on Insurance § 127:6-15, pp. 127-20 to 127-39 (3d ed. 1997).
The first generation of pollution-exclusion clauses — the predecessor to the "absolute" clause — has come to be known as the "qualified" pollution-exclusion clause. See Alabama Plating Co. v. UnitedStates Fid. Guar. Co., 690 So.2d 331, 334 (Ala. 1996). This Court has had five occasions to analyze the scope and application of a qualified pollution-exclusion clause: United States Fidelity Guaranty Co. v. Armstrong, 479 So.2d 1164 (Ala. 1985); Hicks v. AmericanResources Insurance Co., 544 So.2d 952 (Ala. 1989); Essex Insurance Co.v. Avondale Mills, Inc., 639 So.2d 1339 (Ala. 1994); Alabama Plating,supra; and Molton, Allen Williams, Inc. v. St. Paul Fire Marine Insurance Co., 347 So.2d 95 (Ala. 1977). Although there were slight *Page 794 
variations among some of the clauses involved in those five cases, a representative example of the qualified pollution-exclusion clause is the one considered in Armstrong. That clause reads as follows:
 "`This insurance does not apply to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalies, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.'"
479 So.2d at 1168.
In Molton, Allen Williams, the insured had begun constructing roads in a real-estate development, but before the roads were paved, "rain fell upon and flowed across the roads, adjacent ditches, and cuts and fills," 347 So.2d at 96, causing the sandstone found naturally in the earth in that area to break down into sand and wash onto the adjoining property and into three lakes. This Court noted that "`pollution exclusions' [were] relatively new to the insurance industry," and that the fact situation presented "a case of first impression, not only in Alabama, but perhaps for the country." 347 So.2d at 97. The Court agreed with the insured that pollution-exclusion clauses, "strictly construed, were intended to cover only industrial pollution and contamination." 347 So.2d at 99. Conversely, the Court did not believe that the insured "by a reading of the exclusion clause would reasonably expect that the alleged damage caused by its construction activity would be included in the descriptions set out in the `pollution exclusion' clause. In other words, while a liberal construction of the `pollution exclusion' clause would include the damage allegedly caused by [the insured], the clause is not free of ambiguity." 347 So.2d at 99. The Court expressed its understanding that the intent of the pollution-exclusion clause was to eliminate coverage "for damages arising out of pollution or contamination by industry-related activities," finding it telling in that regard that the clause enumerated "specific industry-related irritants, contaminants, and pollutants" (i.e., "smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids, or gases, waste materials or other irritants. . . ."), 347 So.2d at 99.
In Armstrong the insured, in connection with the construction of a sewer system project, crushed, destroyed, or removed existing sewer lines and installed new lines in approximately the same location, occasioning the overflow of raw sewage onto adjacent land. In declining to defend its insured in litigation instituted against it by the landowner, the insurer relied on the qualified pollution-exclusion clause in its policy. On appeal, this Court noted that such a clause was "relatively new to the insurance industry" and that "[i]ts insertion in standard liability policies began in the past decade in an attempt to protect the environment by eliminating coverage for industry-related pollution damages." 479 So.2d at 1168. Noting its holding in Molton, Allen Williams, the Court concluded that to deny coverage under the facts of the case "would be to distort the plain purpose of the pollution exclusion." 479 So.2d at 1168.
In Hicks the insured had conducted permissive strip-mining operations on the plaintiffs' property, but upon cessation of those operations it allowed a pit, which had previously been continuously pumped dry, to fill with water. "This standing water, [the landowners] argue, became contaminated and thereafter contaminated their water supply because of the runoff and seepage, etc., of acids, alkalis, and toxic *Page 795 
chemicals, etc." 544 So.2d at 953. The exclusion clause in Hicks
expressly listed "acids, alkalis [and] toxic chemicals" as being among the types of irritants, contaminants, and pollutants covered by the clause. While acknowledging and reaffirming the holdings of Molton, Allen Williams and Armstrong, this Court noted that in the case before it "the pollutants causing the damage were undisputedly acids, alkalis, toxic chemicals, etc.," 544 So.2d at 954, thereby exactly matching some of the specific pollutants listed in the exclusion. The insured, while not contesting that a "discharge" of those materials had occurred, contended that "the means through which the discharge occurred, i.e., seepage and runoff as opposed to other more `industrial' means," avoided application of the exclusion because the exclusionary clause "was intended to exclude only industrial contamination resulting directly from mechanical instruments or machines." 544 So.2d at 954. This Court rejected that narrow view of the reach of the clause because of the exact "fit" between the language of the exclusion and the polluting substances and the fact that those substances had undeniably been discharged into or upon the land in question.
In Essex, workers dismantling a building came in contact with asbestos contained in the structure, allegedly inhaling asbestos fibers. The insurer of the building owner denied coverage for the ensuing personal-injury claims filed against the owner, on the basis of a qualified pollution-exclusion clause in its policy. On appeal, this Court held, among other things:
 "In the present case, the term used to describe the method in which the `pollution' is disseminated, such as `discharge' and `dispersal,' are terms commonly associated with environmental law and materials classified as `hazardous waste.' Continental Casualty Co. v. Rapid-American Corp., 80 N.Y.2d 640, 609 N.E.2d 506, 593 N.Y.S.2d 966 (1993) (stating that such terms `are terms of art in environmental law used with reference to damage or injury caused by disposal or containment of hazardous waste')."
639 So.2d at 1341-42.
The Court also concluded that "[t]he three places of dissemination mentioned in the exclusion — '. . . land, the atmosphere, or any . . . body of water' — suggest contamination of a broad natural environment rather than the environs of a building." 639 So.2d at 1342. The exclusion was held inapplicable to the fact situation presented there.
Finally, in Alabama Plating, the question was whether an insured was covered under its policies with several insurers "for certain sums it has expended and will be forced to expend for environmental remediation ordered by the Alabama Department of Environmental Management." 690 So.2d at 333. This Court found the "sudden and accidental" language in the exclusion to be ambiguous, after having found it appropriate to consult "[d]ictionaries, particularly those published around 1970, when the `pollution exclusion' clause was first added to [comprehensive general liability] policies." 690 So.2d at 335. Because those dictionaries revealed that an event might be deemed "sudden" either because it was unexpected or, alternatively, because it happened quickly or abruptly, the Court concluded that the word was ambiguous. Having discerned that an ambiguity existed, the Court proceeded to "look to extrinsic evidence of the drafter's intent." 690 So.2d at 335. The Court noted that "the phrase `sudden and accidental' had already undergone judicial construction as language in boiler and machinery insurance policies," and that insurance companies had thereafter chosen to use *Page 796 
the phrase in the pollution-exclusion clause "[i]n the face of this established interpretation." 690 So.2d at 336. In that regard, the Court relied on the proposition quoted from 2 Mark S. Rhodes, Couch onInsurance § 15:20 (2d rev. ed. 1984) that "`judicial construction placed upon particular words or phrases made prior to the issuance of a policy employing them will be presumed to have been the construction intended to be adopted by the parties.'" 690 So.2d at 336. Because courts had uniformly interpreted the phrase "sudden and accidental" in the boiler-and machinery-insurance policy context to mean that the damage had to be unexpected and unintended, and considering other extrinsic sources, the Court concluded that the exclusion did not bar coverage.
In addition to the five cases decided by this Court, three decisions from federal district courts sitting in Alabama have addressed pollution-exclusion clauses, only one of which was a "qualified" pollution-exclusion clause.
In Associated Scrap Metal, Inc. v. Royal Globe Insurance Co.,927 F. Supp. 432 (S.D.Ala. 1995), a qualified pollution-exclusion clause was at issue. A processor of used motor-vehicle batteries dumped the resulting waste-battery acid alongside a swamp, which drained into a nearby bay. "[T]he [Environmental Protection Agency] discovered that a release of hazardous substances had occurred at [the battery reclamation] site," 927 F. Supp. at 435, and demanded payment from the insured, the supplier of the used batteries, for clean-up costs. The insured's demand, in turn, upon its insurer for coverage of the claim, was rejected on the basis of the pollution-exclusion clause. In the resulting action filed by the insured against the insurer, it was "undisputed that under the `pollution exclusion' clause, there was `property damage . . . arising out of the discharge . . . of acids . . . into or upon land, the atmosphere or any water course or body of water." 927 F. Supp. at 436. What was disputed was whether the exemption in the exclusion for discharges and dispersals that were "sudden and accidental" would render the exclusion inapplicable in the face of the fact that the insured had sold the batteries to the processor "not knowing that the battery acid or casings would be handled so as to contaminate the ground, groundwater or bay at or in proximity to the [processing] operations."927 F. Supp. at 435. The district court concluded that the term "sudden and accidental" was ambiguous because it could be understood to mean not just "abrupt" in temporal terms, but could as well be understood to mean "unexpected, or happening without notice." 927 F. Supp. at 438. Accordingly, construing the provision against the insurer, the court found that it had a duty to defend and indemnify the insured.
In 1985, the absolute pollution-exclusion clause replaced the qualified pollution-exclusion clause. The model format dropped the "sudden and accidental" exemption; dropped the phrase "into or upon the land, the atmosphere or any water course or body of water"; added the four conditional phrases represented by subparagraphs II.f.(1)(a), (b), (c), and (d) of the absolute pollution-exclusion clause set forth above; and dropped the adjective "toxic" before the word "chemicals" in the listing of representative pollutants. Some courts have found these changes to be inconsistent with the proposition that the clause, as so revised, was intended still to apply solely to industrial or environmental pollution. See Peace, supra; and Oates v. New York, 157 Misc.2d 618, 597 N.Y.S.2d 550,553 (1993). Other courts have held that the changes did not alter the fact that the operative policy terms "discharge," "dispersal," "release," or "escape" were *Page 797 
environmental terms of art intended to relate only to industrial pollution and contamination and/or environmental pollution. See AtlanticMut. Ins. Co. v. McFadden, 413 Mass. 90, 595 N.E.2d 762 (1992); Centerfor Creative Studies v. Aetna Life Cas. Co., 871 F. Supp. 941
(E.D.Mich. 1994); Sullins v. Allstate Ins. Co., 340 Md. 503, 667 A.2d 617
(1995); Lefrak Org., Inc. v. Chubb Custom Ins. Co., 942 F. Supp. 949
(S.D.N.Y. 1996); American States Ins. Co. v. Koloms, 177 Ill.2d 473,687 N.E.2d 72, 227 Ill. Dec. 149 (1997); and Nautilus Ins. Co. v. Jabar,188 F.3d 27 (1st Cir. 1999). Also, the absolute pollution-exclusion clause "incorporates the concept of a `threatened discharge, disposal, release or a surge of pollutants.'" Ellison, supra. "Liability for a mere threat of an injury is a concept that is fundamental to modern environmental statutes, including CERCLA [Comprehensive Environmental Response Compensation Liability Act a.k.a. `Superfund,' 41 U.S.C. § 9601 et. seq.], but is foreign to normal tort liability," and "[t]he incorporation of environmental liability terms and concepts into the absolute pollution exclusion illustrates that the exclusion was designed to be limited to injury for typical, industrial environmental damage." Ellison, supra. The United States District Court for the Middle District of Alabama addressed an absolute pollution-exclusion clause inShalimar Contractors, Inc. v. American States Insurance Co.,975 F. Supp. 1450 (M.D.Ala. 1997), aff'd without opinion, 158 F.3d 588
(11th Cir. 1998). In that case, the insured, Shalimar Contractors, Inc., had performed lead-abatement work in an apartment building in the same MHA housing project involved in this case, Riverside Heights. A mother and her two young sons, who had resided in one of the apartments, sued Shalimar, alleging that it had temporarily left debris containing lead on the porch beside their apartment unit and had temporarily discarded, out in the open, lead-contaminated clothing worn by its workers. The plaintiffs alleged that, as a result, they had been exposed to lead and were suffering from lead poisoning. Shalimar's insurer denied coverage, relying on the absolute pollution-exclusion clause in its policy. Although Shalimar, in the collateral declaratory-judgment action it brought in federal district court, specifically cited only the exclusion provisions corresponding to those in the Audubon policy labeled II.f.(1)(b) and (c) and II.f.(2), the court noted that provision II.f.(1)(d)(ii) was "equally pertinent." The court took note of Molton,Allen Williams, Armstrong, and Alabama Plating, but concluded that the qualified pollution-exclusion clauses involved in those cases were markedly different from the absolute pollution-exclusion clause at issue, which the court found to be "far more developed and specific than the abrupt language" in the qualified pollution-exclusion clause.975 F. Supp. at 1456. The court further noted that, unlike the qualified clause, the absolute clause "makes no reference to whether the release was into or upon land, the atmosphere, or water, or whether the release was sudden, accidental, or gradual in nature." 975 F. Supp. at 1456. After noting that "Shalimar does not contend that any specific terms of the pollution exclusion are ambiguous," and was not contending "that it did not handle, store, or dispose of the lead contaminated materials alleged to have caused the . . . children's injuries,"975 F. Supp. at 1455, the court stated that "absent any evidence or argument that the language in this particular exclusion is ambiguous, [Shalimar's] argument that the present exclusion should be limited to intentional pollution of the environment at large is without merit." 975 F. Supp. at 1456. The court pointed out that Shalimar "offers no contention that any word or phrases in this exclusion could *Page 798 
be reasonably interpreted by people of ordinary intelligence to have two contradictory meanings" and that "[a]ccordingly the court [found] that the language in the exclusion [was] not ambiguous and that a person of ordinary intelligence would interpret the language according to its plain meaning, that any bodily injury resulting from the release or escape of pollutants as a result of Shalimar's handling or storage of waste or from any location occupied by Shalimar would not be covered under the insurance contract." 975 F. Supp. at 1456-57 (footnote omitted).
Under the facts before it, the Shalimar court declined to follow the holdings of cases from other jurisdictions that found that the terms "discharge, dispersal, release, and escape are environmental terms of art," agreeing instead with the reasoning in United States LiabilityInsurance Co. v. Bourbeau, 49 F.3d 786, 788 (1st Cir. 1995), that coverage would be excluded for "contamination of property caused by the removal and discharge of lead paint chips." 975 F. Supp. at 1458. The court emphasized that "Shalimar does not contend that [it] did not handle, store, or transport the lead bearing waste" and, consequently, found the facts to be that "Shalimar was handling, storing, and transporting pollutants in the form of waste contaminated with lead in connection with the lead abatement work being carried out at the Riverside Heights Housing Project." 975 F. Supp. at 1458. We note that inBourbeau the insured was likewise involved in removing lead paint from a building and also deposited debris containing lead on the surrounding land. In connection with litigation subsequently brought by the landowner, the insurer sought a judicial declaration that it was not obligated to defend or indemnify the insured for the damages occasioned when the insured "caused lead-based paint to be discharged upon the land. . . ." 49 F.3d at 788 n. 2. Bourbeau distinguished another case,Atlantic Mutual Insurance Co. v. McFadden, 413 Mass. 90, 595 N.E.2d 762
(1992), which held that an absolute pollution-exclusion clause was inapplicable where the insured was being sued for the lead poisoning of two young children who, while residents of a dwelling owned by the insured, had been exposed to lead in the paint and plaster. The Bourbeau
court commented:
 "More importantly, McFadden was not an environmental pollution case. McFadden concerned personal injury caused by the presence of lead paint in a household. This case concerns injury to property caused by the alleged negligent discharge of lead paint onto property. The latter is a classic example of `pollution' — the discharging of a harmful substance onto land — while the former is most demonstrably not. An objectively reasonable person simply would not ascribe the word `pollution' to the presence of lead paint in a house. This, we think, is the point of McFadden. This interpretation is consistent with the [Supreme Judicial Court's] observation in that case that `the terms used in the pollution exclusion, such as "discharge," "dispersal," "release," and "escape," are terms of art in environmental law which generally are used with reference to damage or injury caused by improper disposal or containment of hazardous waste.'"
49 F.3d at 789.
The court in Shalimar assumed, without any specific analysis, that Shalimar's activities in depositing lead-bearing waste debris and clothing qualified as a discharge, dispersal, or release of those materials. It thus focused its analysis mainly on the question whether lead was a pollutant. After noting that lead was recognized as a hazardous toxic substance by the statutory law of both the State of Alabama and the *Page 799 
federal government, the court concluded that "the lead bearing debris at issue in this case clearly qualifies as a solid contaminant and pollutant." 975 F. Supp. at 1458.
Haman, Inc. v. St. Paul Fire Marine Insurance Co.,18 F. Supp.2d 1306 (N.D.Ala. 1998), involved a variation of the absolute pollution-exclusion clause. The offending substance in that case was methyl parathion, a highly toxic pesticide. An exterminator had used it at a hotel owned by the insured. Subsequently, "the [Environmental Protection Agency] forced [the insured] to close the hotel and to decontaminant it before reopening to the public." 18 F. Supp.2d at 1307. The insured sought reimbursement from its insurer for the financial losses it had incurred as a result of the closing and the cleaning efforts. In the action that resulted after the insurer denied the insured's demand for reimbursement, the federal district court concluded that methyl parathion was "without legitimate dispute, a `pollutant or contaminant.'" 18 F. Supp.2d at 1308. It noted that methyl parathion was a highly regulated chemical that could be used only in uninhabited open fields. Because the exclusion barred coverage for pollution caused "by the release, discharge, dispersal, seepage, migration, or escape of pollutants or contaminants," 18 F. Supp.2d at 1308 n. 2, the court held that "the policy excludes coverage for the methyl parathion damage" to the hotel. 18 F. Supp.2d at 1308. Apparently, the insured raised no issue as to whether the allegedly "improper extermination services" giving rise to the application of the pesticide at the hotel constituted a "release, discharge, dispersal, seepage, migration, or escape of pollutants or containments." At any rate, the opinion does not address that element of the pollution-exclusion clause.
This Court has discussed the identification and resolution of ambiguities in insurance policies as follows:
 "`The test to be applied by [a] court in determining whether there is ambiguity is not what the insurer intended its words to mean, but what a reasonably prudent person applying for insurance would have understood them to mean.' Lee R. Russ Thomas F. Segalla, Couch on Insurance § 21:14, pp. 21-23 (3d ed. 1997); see, also, Western World Ins. Co. v. City of Tuscumbia, 612 So.2d 1159, 1161 (Ala. 1992) (same); St. Paul Fire Marine Ins. Co. v. Edge Memorial Hosp., 584 So.2d 1316, 1322 (Ala. 1991) (stating that language in an insurance policy should be given the same meaning that an ordinary person, not a lawyer, would reasonably ascribe to the language). The terms of an insurance policy are ambiguous only if the policy's provisions are reasonably susceptible to two or more constructions or there is reasonable doubt or confusion as to their meaning. See United Services Auto. Ass'n v. Smith, 57 Ala. App. 506, 329 So.2d 562
(Ala.Civ.App. 1976). In determining whether an ambiguity exists, a court should apply the common interpretation of the language alleged to be ambiguous. See Alabama Farm Bureau Mut. Cas. Ins. Co. v. Goodman, 279 Ala. 538, 541, 188 So.2d 268, 270
(1966). This means that the terms of an insurance policy should be given a rational and practical construction. Green v. Merrill, 293 Ala. 628, 308 So.2d 702 (1975). Also, a court cannot consider the language in the policy in isolation, but must consider the policy as a whole. Turner v. United States Fidelity Guar. Co., 440 So.2d 1026 (Ala. 1983)."
State Farm Fire Cas. Co. v. Slade, 747 So.2d 293, 308-09 (Ala. 1999). "Further, this Court has ruled that exceptions to coverage must be interpreted as narrowly *Page 800 
as possible to provide the maximum coverage available." Sullivan v. StateFarm Mut. Auto. Ins., 513 So.2d 992, 994 (Ala. 1987).
 "It is well established . . . that when doubt exists as to whether coverage is provided under an insurance policy, the language used by the insurer must be construed for the benefit of the insured. Likewise, when ambiguity exists in the language of an exclusion, the exclusion will be construed so as to limit the exclusion to the narrowest application reasonable under the wording. Guaranty National Ins. Co. v. Marshall County Board of Educ., 540 So.2d 745
(Ala. 1989). However, it is equally well settled that in the absence of statutory provision to the contrary, insurers have the right to limit their liability by writing policies with narrow coverage. If there is no ambiguity, courts must enforce insurance contracts as written and cannot defeat express provisions in a policy, including exclusions from coverage, by making a new contract for the parties. Johnson v. Allstate Ins. Co., 505 So.2d 362 (Ala. 1987)."
St. Paul Mercury Ins. Co. v. Chilton-Shelby Mental Health Ctr.,595 So.2d 1375, 1377 (Ala. 1992).
Rarely has any issue spawned as many, and as variant in rationales and results, court decisions as has the pollution-exclusion clause. "The scope of the pollution exclusion is an evolving area of law, subject to differing interpretations. The pollution exclusion is one of the most frequently litigated exceptions found in a staple insurance industry product — the comprehensive general liability policy." Kemper Nat'lIns. Cos. v. Heaven Hill Distilleries, Inc., 82 S.W.3d 869 (Ky. 2002). InDeni Associates of Florida, Inc. v. State Farm Fire CasualtyInsurance Co., 711 So.2d 1135 (Fla. 1998), the Supreme Court of Florida noted that the insureds involved in the case, together with the amici curiae who filed briefs on their behalf, had cited more than 100 cases from 36 other states in support of the proposition that the plain language of the pollution-exclusion clause would serve to deny coverage under the facts of the case. 711 So.2d at 1137 n. 2. The proliferation of caselaw in this area is such that in just the nine months subsequent to Judge DeMent's January 31, 2002, certification order, almost 60 additional cases addressing pollution-exclusion clauses have been released by various state and federal courts, commencing with EssexInsurance Co. v. Berkshire Environmental Consultants, Inc., (No. CIV.A. 99-30280-FHF) (D.Mass. February 7, 2002) (not published in F. Supp.), and concluding with Due v. King, [Ms. No. 01-3287, Oct. 23, 2002]258 Wis.2d 982, 654 N.W.2d 94 (Wis.Ct.App. 2002). Overall, we are confronted with a body of caselaw comprising over 150 decisions. (Those that analyze and apply absolute pollution-exclusion clauses are, for the most part, collected by title in the state-by-state jurisdictional table of cases set forth in Claudia G. Catalano, Annotation, What Constitutes"Pollutant," "Contaminant," "Irritant," or "Waste" Within Meaning ofAbsolute or Total Pollution Exclusion Liability Insurance Policy, in 98 ALR 5th 193 (2002)).
Our review and analysis of the entire body of existing precedent reveals that there exists not just a split of authority, but an absolute fragmentation of authority. Cases may be found for and against every issue any litigant has ever raised, and often the cases reaching the same conclusion as to a particular issue do so on the basis of differing, and sometimes inconsistent, rationales. To guide our approach to this universe of precedent, we first parse the *Page 801 
structure of the absolute pollution-exclusion clause at issue here. As may be discerned from a close reading of it, its applicability depends upon the affirmative confluence of three elements: the bodily injury or property damage in question must have been caused by exposure to a "pollutant"; that exposure must have arisen out of the actual, alleged, or threatened discharge, dispersal, release, or escape of the pollutant; and that discharge, dispersal, release, or escape must have occurred at or from certain locations or have constituted "waste." In other words, the exclusion comes into play only with respect to bodily injury or property damage arising out of the discharge, dispersal, release, or escape (terms not defined in the policy) of pollutants (a term defined in the policy) at or from certain categories of locations, or which have been transported, stored, handled, treated, disposed of, or processed "as waste." Most of the cases have involved disputes over whether a particular substance qualified as a pollutant. That inquiry devolves into an analysis of whether the substance can properly be classified as an "irritant" or a "contaminant," which terms expressly include certain specified items, such as those indisputably involved in Armstrong, supra: "acids, alkalies [and] toxic chemicals." 479 So.2d at 1168. Representative of the divergence that can arise in caselaw even as to a single substance are the several cases finding that carbon monoxide is a pollutant, contrasted with the several cases finding that it is not. See Catalano, What Constitutes "Pollutant," 98 ALR 5th 193. Because the subset of cases that address whether lead in paint qualifies as a pollutant is quite well developed, comprising some 35 cases and in the aggregate adequately presenting and analyzing all of the supporting and opposing contentions, we pretermit a separate comprehensive review of the general body of caselaw addressing whether a variety of other substances should be classified as pollutants. Likewise, there has now developed an ample body of caselaw addressing whether the processes whereby lead paint peels and flakes, and/or generates lead dust, constitute a discharge, dispersal, release, or escape for purposes of a pollution-exclusion clause. All of the arguments and resolutions on both sides of the issue are quite adequately developed in the cases considering specifically lead-paint exposure.
One of the earliest, and most often cited, cases addressing an absolute pollution-exclusion clause in the context of lead-paint poisoning of children occupying rented premises is Atlantic Mutual Insurance Co. v.McFadden, supra. In that case the Supreme Judicial Court of Massachusetts concluded that "an insured could reasonably have understood" the clause "to exclude coverage for injury caused by certain forms of industrial pollution, but not coverage for injury allegedly caused by the presence of leaded materials in a private residence." 413 Mass. at 91,595 N.E.2d at 763. The court noted that the terms "discharge," "dispersal," "release," and "escape" were "terms of art in environmental law which generally are used with reference to damage or injury caused by improper disposal or containment of hazardous waste." 413 Mass. at 92, 595 N.E.2d at 764.
The trial courts, intermediate appellate courts, and highest appellate court of New York have had occasion to address pollution-exclusion clauses in the context of lead-paint poisoning more often than any other jurisdiction. Although one of the first New York courts to address the issue excluded a claim of injury to a child by lead poisoning resulting from the presence of lead paint in a residential apartment, Oates v.State, 157 Misc.2d 618, 597 N.Y.S.2d 550 (Ct.Cl. 1993), appeal withdrawn *Page 802 
upon stipulation, 206 A.D.2d 979, 615 N.Y.S.2d 993 (1994), that case was subsequently referenced dismissively by another New York court as a decision of "the Court of Claims," which was not binding on any other trial court in New York. See Generali-U.S. Branch v. Caribe RealtyCorp., 160 Misc.2d 1056, 612 N.Y.S.2d 296 (Sup.Ct. 1994). All of the New York trial court and intermediate appellate court decisions subsequent toOates have held the pollution-exclusion clause inapplicable to lead-paint poisoning. See, e.g., Generali-U.S. Branch, supra; General Accident Ins.Co. of America v. Idbar Realty Corp., 163 Misc.2d 809, 622 N.Y.S.2d 417
(Sup.Ct. 1994); GA Ins. Co. of New York v. Naimberg Realty Assocs.,233 A.D.2d 363, 650 N.Y.S.2d 246 (1996); Cepeda v. Varveris,234 A.D.2d 497, 651 N.Y.S.2d 185 (1996); and Westview Assocs. v. GuarantyNat'l Ins. Co., 95 N.Y.2d 334, 740 N.E.2d 220, 717 N.Y.S.2d 75 (2000). InWestview Associates, New York's highest appellate court concluded that the definition of pollutants in the exclusion clause in the umbrella policy at issue, which included "smoke, vapors, soot, fumes, acid, sound, alkalies, chemicals, liquids, solids, gases, thermal `Pollutants,' and all other irritants and `Contaminants,'" did not demonstrate "the drafter's intent to incorporate lead paint into the pollution exclusion clauses." 95 N.Y.2d at 340, 740 N.E.2d at 223, 717 N.Y.S.2d at 78. (The thrust of that holding is tempered somewhat by the court's consideration of the interaction between the umbrella policy and the underlying policy, which contained an express exclusion for injuries caused by lead paint.) The federal district courts in New York, applying the law of that state concerning the inapplicability of absolute pollution-exclusion clauses to residential lead-paint poisonings, have likewise held that the clause does not bar coverage for such incidents. See Lefrak Org., Inc.v. Chubb Custom Ins. Co., supra, and Sphere Drake Ins. Co. v. Y.L. RealtyCo., 990 F. Supp. 240 (S.D.N.Y. 1997).
As previously noted, the United States Court of Appeals for the First Circuit held in Bourbeau that lead-paint contamination to surrounding soil from lead-paint chips deposited in connection with the stripping and removing of old paint from a building was covered by the pollution-exclusion clause although, under the teaching of McFadden,supra, the pollution-exclusion clause "was not intended to exclude from coverage injuries caused by the presence of lead paint in a household."Bourbeau, 49 F.3d at 789. Consistent with that distinction thus established in the law of Massachusetts, the court in Rubin v. St. PaulFire Marine Ins. Co., 3 Mass. L.Rptr. 680 (Mass.Super.Ct. 1995), held that an insured that had incurred expenses in remediating premises contaminated by hazardous waste materials in the form of lead and oil could not recover from his insurer because the applicable policy contained an absolute pollution-exclusion clause. The court explained that under Bourbeau, clean-up costs for lead contamination of soil would fall within the absolute pollution-exclusion clause, but that underMcFadden the exclusion would not apply to personal injuries resulting from lead paint in a private residence.
The federal district courts in Pennsylvania and the Pennsylvania intermediate appellate courts have concluded in a series of cases that a pollution-exclusion clause bars coverage for lead-paint poisoning claims.[1] *Page 803 
The Supreme Court of Pennsylvania, however, overruled those prior cases in Lititz Mutual Ins. Co. v. Steely, 567 Pa. 98, 785 A.2d 975 (2001) ("Lititz II"). The Supreme Court concluded that "of those jurisdictions that have decided the issue, a majority have found that the pollution exclusion clause does not bar coverage [for injuries allegedly arising out of the ingestion or inhalation of lead-based paint]." 567 Pa. at 106
n. 8, 785 A.2d at 980 n. 8. Turning first "to the question whether lead-based paint is a pollutant within the meaning of the exclusion," the court remarked that that was "the simpler of the two policy terms to construe." 567 Pa. at 107, 785 A.2d at 980. Relying on such precedent asSt. Leger v. American Fire Casualty Insurance Co., 870 F. Supp. 641
(E.D.Pa. 1994), and Oates, supra, the court concluded that the definition of "pollutant" in the pollution-exclusion clause "unambiguously encompasses lead-based paint." 567 Pa. at 108, 785 A.2d at 980. Turning then to the question whether the exclusion's requirement that there be a "discharge, dispersal, release, or escape" of pollutants was also unambiguous, with reference to the process by which lead-based paint becomes available for ingestion and inhalation, the court concluded that the clause was ambiguous. The court opined that "in determining whether there has been a discharge, dispersal, release, or escape, it is necessary to assess the specific form of movement in question."567 Pa. at 108, 785 A.2d at 981. Stated differently, the issue was "whether the process by which lead-based paint becomes available for human ingestion/inhalation unambiguously involves a type of motion that can be characterized as a discharge, dispersal, release, or escape."567 Pa. at 108, 785 A.2d at 981. After considering expert testimony in the record, the court observed that "the process by which lead-based paint becomes available for human ingestion/inhalation does not, in the usual case, occur quickly. Rather, the process of surface degradation occurs continually, but at a slow rate." 567 Pa. at 109, 785 A.2d at 981. It noted that the court in Byrd v. Blumenreich, 317 N.J. Super. 496,722 A.2d 598 (1999), had concluded that the terms "discharge, dispersal, release, or escape" ordinarily implied an active or clearly perceived physical event, and thus would not apply to the imperceptible flaking of lead paint, which is attributable to an involuntary process that occurs over a considerable period of time. 567 Pa. at 109, 785 A.2d at 981. In stating its final assessment and holding in Lititz II, the Supreme Court of Pennsylvania endorsed the Byrd analysis, as follows:
 "This, in our view, is the natural, plain, and ordinary meaning of the exclusionary language as it applies (or, more precisely, does not apply) to the dissemination of lead-based paint in a residential setting. One would not ordinarily describe the continual, imperceptible, and inevitable deterioration of paint that has been applied to the interior surface of a residence as a discharge (`a flowing or issuing out'), a release (`the act or an instance of liberating or freeing'), or an escape (`an act or instance of escaping'). See Madison [Constr. Co. v. Harleysville Mut. Ins. Co., 557 Pa. 595, 735 A.2d 100, 108 (1999)]. Arguably such deterioration could be understood to constitute a `dispersal,' the definition of which (`the process . . . of . . . spreading . . . from one place to another,' id.) may imply a gradualism not characteristic of the other *Page 804 
terms. Any such inconsistency in meaning simply indicates, however, that the exclusionary language does not clearly include or exclude the physical process here at issue, but is, as to that process, ambiguous. Such ambiguity requires that the language be interpreted in favor of the insured. We conclude, therefore, that the pollution exclusion clause does not preclude coverage for the injuries alleged to have occurred in this case."
567 Pa. at 109-10, 785 A.2d at 981-82 (footnotes omitted). In Mistick,Inc. v. Northwestern National Casualty Co., 806 A.2d 39 (Pa.Super.Ct. 2002), the Superior Court of Pennsylvania adhered to the controlling precedent established by Lititz II and held that, assuming that lead-based paint conformed to the definition of "pollutant" in the exclusion, the terms "discharge, dispersal, . . . release or escape" did not include "abrasion of lead-based paint." 806 A.2d at 43.
In Sullins v. Allstate Insurance Co., 340 Md. 503, 667 A.2d 617
(1995), the Court of Appeals of Maryland, that state's highest appellate court, concluded that the terms "contaminants" and "pollutants" in the pollution-exclusion clause were ambiguous and that those terms thus were to be construed against the insurer in the context of lead poisoning suffered by an infant tenant as a result of the ingestion of lead paint that had chipped and flaked. The court concluded that the terms were susceptible of two interpretations by a reasonably prudent layperson; by one interpretation the terms would encompass lead paint, but by another those terms would apply only to cases of environmental pollution or contamination and not to products such as lead paint. The court observed that "[a] term which is clear in one context may be ambiguous in another." 340 Md. at 508, 667 A.2d at 619. "We conclude that an insured could reasonably have understood the provision at issue to exclude coverage for injury caused by certain forms of industrial pollution, but not coverage for injury allegedly caused by the presence of leaded materials in a private residence." 340 Md. at 511, 667 A.2d at 620. The court further found ambiguity from the fact that the terms "contaminant" and "pollutant," as well as the operative terms "discharge, dispersal, release, or escape," were terms of art in environmental law.340 Md. at 514-15, 667 A.2d at 622-23. Acknowledging the split of authority on the question whether the pollution-exclusion clause was ambiguous, the court observed that some courts had held that such an "existence of conflicting judicial interpretations of insurance policy terms is evidence of ambiguity, while others hold such conflict is not conclusive."340 Md. at 517, 667 A.2d at 623. The court then declared:
 "We hold that conflicting interpretations of policy language in judicial opinions is not determinative of, but is a factor to be considered in determining the existence of ambiguity. In interpreting an insurance policy, we must follow the rules of contract construction set out in . . . this opinion. However, if other judges have held alternative interpretations of the same language to be reasonable, that certainly lends some credence to the proposition that the language is ambiguous and must be resolved against the drafter."
340 Md. at 518, 667 A.2d at 624.
The court was further of the opinion that the revision in terminology effected by the insurance industry in 1985 in adopting the absolute pollution-exclusion clause, which nonetheless retained the terms "discharge, dispersal, release, or escape," was not meant to expand the scope of the clause to non-environmental damage.
Other jurisdictions holding that the absolute pollution-exclusion clause is clearly *Page 805 
inapplicable to lead poisoning caused by ingesting or inhaling lead paint, or at least ambiguous in that context, are Weaver v. RoyalInsurance Co. of America, 140 N.H. 780, 674 A.2d 975 (1996); InsuranceCo. of Illinois v. Stringfield, 292 Ill. App.3d 471, 685 N.E.2d 980, 226 Ill. Dec. 525 (1997); Danbury Insurance Co. v. Novella, 45 Conn. Sup. 551,727 A.2d 279 (1998); Byrd v. Blumenreich, supra; and Unisun InsuranceCo. v. Schulwolf, 53 Va. Cir. 220 (Va. Cir.Ct., August 23, 2000). Conversely, the following cases have held the pollution-exclusion clause to be unambiguous in the context of lead poisoning from lead paint and have applied it to bar coverage: Auto-Owners Insurance Co. v. Hanson,588 N.W.2d 777 (Minn.Ct.App. 1999); Peace v. Northwestern NationalInsurance Co., supra; Auto Owners Insurance Co. v. City of Tampa HousingAuthority, 231 F.3d 1298 (11th Cir. 2000) (applying Florida law); andHartford Underwriter's Insurance Co. v. Turks, 206 F. Supp.2d 968
(E.D.Mo. 2002) (applying Missouri law to a homeowner's policy that included among its express definition of the term "pollutants" the substance "lead paint").
With respect to the issue whether lead paint qualifies as a pollutant under the terms of the absolute pollution-exclusion clause, we conclude that it does. We agree with those courts that recognize it to be a chemical and an irritant and/or a contaminant, e.g., Oates,157 Misc.2d at 622, 597 N.Y.S.2d at 554 ("lead paint is a chemical and a contaminant that can irritate or poison"); Shalimar, supra; Peace,228 Wis.2d at 123, 596 N.W.2d at 436 ("`Lead' is a chemical element with particular properties. It may be `used in a chemical process.' It clearly fits within the definition of `chemical.'"); and Auto Owners Ins. Co. v. TampaHousing Authority, 231 F.3d at 1300 ("lead . . . is a chemical"). The hazard posed by exposure to lead has been recognized by our Legislature in both § 25-8-35(6), Ala. Code 1975, which prohibits persons under 16 years of age from being employed "[i]n the manufacture or packing of paints, colors, or white or red lead," and the "Alabama Lead Reduction Act of 1997," codified at § 22-37A-1 et seq., Ala. Code 1975. Likewise, exposure to lead from lead-contaminated paint is labeled a "hazard" in the Residential Lead-Paint Hazard Reduction Act of 1992.42 U.S.C. § 4851b(15). Lead has been identified as a pollutant in the context of ambient air quality under the Clean Air Act.40 C.F.R. § 50.2, 50.12. In Shalimar, supra, the district court listed other federal statutes and regulations that classify lead as a contaminant in various settings. We conclude that at the time Audubon's policy was issued in 1991, a reasonable insured would have understood that lead would qualify as a pollutant by virtue of its being an irritant or contaminant and a chemical.
On the other hand, we conclude that a reasonably prudent insured might have concluded in 1991 that the presence of lead-paint flakes, chips, and/or dust in a residential apartment would not qualify as a discharge, dispersal, release, or escape of a pollutant. See Sphere DrakeInsurance, 990 F. Supp. at 243. ("These terms do not ordinarily encompass the type of `movement' associated with lead paint poisoning. Lead paint poisoning is not caused by `discharge, dispersal, release, or escape;' rather, lead poisoning results from ingestion or inhalation of paint that has flaked over time."); Byrd, 317 N.J. Super. at 504, 722 A.2d at 602
(holding that each of those words implies "an active or clearly perceived physical event," and would not, "especially when used together, ordinarily [be] understood to apply to the imperceptible chipping or flaking of lead paint which is attributable, not to an active or physical *Page 806 
event, but rather to a involuntary effect occurring over a considerable period of years"); and Lititz II, supra. Given this Court's characterization in Essex v. Avondale Mills, supra, of "discharge" and "dispersal" as terms commonly associated with environmental law, an insurer subsequently employing those terms can be presumed to have intended the same construction as used by the Court. Alabama Plating,supra.
We appreciate that other courts have held that the presence of lead chips, flakes, or dust in an apartment qualifies as a discharge, dispersal, release, or escape. See Peace, supra; St. Leger, supra;Oates, supra; and Turks, supra. Nonetheless, we consider the better-reasoned view to be that, in the specific context of the separation of particles of lead paint from the interior surfaces of a residential apartment, the terms "discharge," "dispersal," "release," or "escape" are "reasonably susceptible to two or more constructions [and] there is reasonable doubt or confusion as to their meaning." Slade,supra, 747 So. at 309. "Exceptions to coverage must be interpreted as narrowly as possible in order to provide maximum coverage for the insured, and must be construed most strongly against the company that drew the policy and issued it." Alliance Ins. Co. v. Reynolds,494 So.2d 609, 612 (Ala. 1986). Where there is no ambiguity in the terms of an insurance contract, the language must be enforced as written, and courts cannot defeat express provisions in a policy, including exclusions from coverage, by making a new contract for the parties; however, "`when ambiguity exists in the language of an exclusion, the exclusion will be construed so as to limit the exclusion to the narrowest application reasonable under the wording.'" Carpet Installation Supplies ofGlenco v. Alfa Mut. Ins. Co., 628 So.2d 560, 562 (Ala. 1993) (quotingSt. Paul Mercury Ins. Co. v. Chilton-Shelby Medical Health Ctr., 595 So.2d at 1377).
Having concluded that the operative terms "discharge," "dispersal," "release," or "escape" are ambiguous in the context of flaking and peeling lead paint in a residential apartment, we construe them against Audubon and thereby determine that the absolute pollution-exclusion clause does not bar coverage in that specific and particular setting. Thus, Audubon's duty to defend was triggered as to the claims in the underlying lawsuit predicated on the children's personal injuries that allegedly were caused by their inhalation and ingestion of lead disseminated through the "peeling and flaking" of lead paint. Neither the district judge's certification order, nor the parties' briefs to this Court, suggest that either of the two children (born October 16, 1991, and May 2, 1993, respectively) ingested lead paint from any intact accessible painted surfaces. There are, however, ambiguous assertions in the complaint that "lead was found or should have been found upon inspection in the water, in the pipes, in the paint, and in the soil surrounding the complex." (Emphasis added.) There is also the allegation that the children were exposed "to lead-based paint and/or other lead contamination on the premises of MHA." (Emphasis added.) Although the certification order of the district judge refers to "lead which was contained in the blinds," our reading of the complaint in the underlying lawsuit reveals that reference to the presence of lead in "blinds" was made only in a paragraph (no. 16) that related to another landlord, who was not shown to have been insured by Audubon. Lastly, as noted earlier, the complaint in the underlying lawsuit asserts not only that the "refurbishment" project "disturbed the chipping lead paint and caused lead dust and paint chips to be *Page 807 
disbursed on the Riverside Heights premises," but also that the refurbishment "created lead dust from lead paint." We do not attempt to interpret definitively the import of all of those varying allegations concerning the location, mode of creation, and mode of movement of the lead and/or lead paint. We content ourselves with answering the certified question by stating that, as to the peeling and flaking interior surface lead paint that resulted in the presence of lead-paint particles (including lead dust), which were then ingested and/or inhaled by the children, the absolute pollution-exclusion clause serves as no bar to Audubon's otherwise existing duty to defend the MHA in the underlying lawsuit. As noted earlier in the excerpt quoted from Acceptance InsuranceCo. v. Brown, 832 So.2d at 14, "When a complaint alleges both acts covered under the policy and acts not covered, the insurer is under a duty to at least defend the allegations covered by the policy." However, the underlying lawsuit having been settled and concluded, we leave it to the district judge to decide how retroactively to apply this holding to the costs incurred by the MHA in defending that lawsuit.
Because, as also stated in Brown, an insurer's duty to defend is more extensive than its duty to indemnify, and because the record is not fully and clearly developed as to some of the issues noted above, we likewise limit our analysis of Audubon's duty to indemnify to the same specific scenario posited in connection with our finding of a duty to defend: personal injuries arising out of the inhalation and/or ingestion of lead-paint particles (including lead dust) resulting from the peeling and flaking of interior surface lead paint. As to that set of circumstances, Audubon would have a duty to indemnify the MHA in the underlying lawsuit, subject to resolution of the other issues next noted.
We decline the request of the MHA and Porterfield to address the issue whether certain of Audubon's dealings with the MHA serve to estop it from relying on the pollution-exclusion clause or would represent a waiver by it of reliance on the clause. We likewise decline to respond to Audubon's argument that because the settlement in the underlying lawsuit obliges the MHA to pay the $1,000,000 portion of the judgment only if and to the extent coverage was available to it under the Audubon policy, the condition in the policy requiring Audubon to pay only "those sums that the insured [MHA] becomes legally obligated to pay as damages" has not been met and no coverage has been triggered. Judge DeMent has not sought our opinion as to those particular issues and has not indicated "that there are no clear controlling precedents in the decisions" of this Court sufficient for the proper determination of those issues, as is required by Rule 18, Ala.R.App.P.
QUESTION ANSWERED.
Moore, C.J., and Houston, See, Lyons, Brown, Johnstone, Woodall, and Stuart, JJ., concur.
[1] Kaytes v. Imperial Cas. Indemn. Co., (No. Civ.A. 93-1573) (E.D.Pa. Jan. 6, 1994) (not published in F. Supp.); St. Leger v.American Fire Cas. Ins. Co., 870 F. Supp. 641 (E.D.Pa. 1994), aff'd without opinion, 61 F.3d 896 (3d Cir. 1995); Kaytes v. Scottsdale Ins.Co., (No. CIV.A. 97-3225) (E.D.Pa. Dec. 9, 1997) (not published in F. Supp.); Lititz Mutual Ins. Co. v. Steely, 746 A.2d 607 (Pa.Super.Ct. 1999); and Fayette County Housing Auth. v. Housing RedevelopmentIns. Exchange, 771 A.2d 11 (Pa.Super.Ct. 2000).